Motion to dismiss appeal denied March 21; argued at Pendleton
May 1; affirmed May 23; rehearing denied July 11, 1933

## FIRST NATIONAL BANK OF BURNS ET AL. *v.*
## FRAZIER ET AL.
(19 P. (2d) 1091, 22 P. (2d) 325)

*Hallock, Donald & Banta,* of Baker, for the motion.
*S. J. Bischoff,* of Portland, and *H. V. Schmalz,* of Burns, opposed.

PER CURIAM. Respondent, Basche Sage Hardware Company, moves to dismiss this appeal on two grounds: (1) That the transcript on appeal is not duly certified to, and (2) that said transcript, on its face shows that it was not filed in this court within 30 days after the appeal had become perfected.

■ An examination of the transcript on appeal filed in this court shows that it contains a copy of the decree appealed from, a copy of the notice of appeal with service indorsed thereon, and a copy of the undertaking on appeal with service indorsed thereon. The filing of these papers, duly certified to, within 30 days after the appeal has been perfected confers jurisdiction upon this court to hear and determine the appeal.

■ The transcript on appeal contains not only the documents referred to but also copies of the pleadings, motions and orders made and filed during the trial of the cause and the certificate of the county clerk attached thereto certifies that they are true and correct copies of all such documents. They are all attached together and constitute the transcript on appeal. While containing more than is required in the filing of the transcript, they do not contain less and no essential document is omitted therefrom. For that reason, we do not think the motion on that ground is well taken.

■ It appears from the transcript on appeal that the decree was rendered September 30, 1932. The notice of appeal, with service indorsed thereon, was filed in the court below on November 18, service of the notice having been made on the preceding day. On November 26, an undertaking on appeal was filed in the lower court. It, however, was a defective undertaking and was later held to be invalid by the learned trial judge. On its face it showed two defects. Section 7-504, Oregon Code 1930, provides that an undertaking on appeal "shall be given with one or more sureties, to the effect that the appellant will pay all damages, costs, and disbursements which may be awarded against him on the appeal". The undertaking as filed obligated the appellant and his surety for the payment of costs only and, therefore, was not in compliance with the provisions of the statute. In terms also the undertaking limited the liability under the undertaking to the sum of $300 only, which also is contrary to the provisions of the statute. Because of these defects in the undertaking, respondent moved to strike the same from the files. This motion was filed on December 5 and on the same day appellant moved for leave to file a new undertaking. Both motions were sustained by an order which was filed and entered on December 12. The new undertaking was filed on December 15. The transcript on appeal was not filed in this court until January 18, 1933, and respondent claims that it was filed too late.

The statute provides that the transcript on appeal shall be filed in this court, unless the time therefor has been extended by an order made by the judge of the trial court or one of the justices of this court, within 30 days after the appeal has been perfected. It also provides that the adverse party, or his attorney, shall have five days after the service of the undertaking on

appeal within which to except to the sufficiency of the sureties, or he shall be deemed to have waived his right thereto, and by subdivision 4 of section 7-503, Oregon Code 1930, it is provided: ''From the expiration of the time allowed to except to the sureties in the undertaking, or from the justification thereof if excepted to, the appeal shall be deemed perfected''.

It is because of this provision that respondent contends that the transcript on appeal was not filed within the time provided, or, in other words, within 30 days after the appeal had become perfected. Respondent claims that the appeal became perfected five days after the filing of the defective undertaking because no exceptions were filed to the sufficiency of the surety.

It is clear from the reading of the appeal statutes that the intention of the statute in granting the right to appeal is to safeguard the rights of the respondent by requiring the filing of a good and sufficient undertaking by the appellant, and to give to the respondent an opportunity to except to the sufficiency of the sureties if they were not financially responsible. And this safeguard would be defeated if the statute could be construed to mean that, under the circumstances above stated, the respondent would be deprived of the right to except to the sufficiency of the surety upon the new undertaking given in this case. Clearly, when the first undertaking was filed, respondent had the right to move to strike the same from the files and the trial court had the authority to grant the right to file a new and proper undertaking and, since the respondent had five days thereafter to except to the sufficiency of the surety on the new undertaking, the appeal could not become perfected until the expiration of that period. To otherwise construe the statute would defeat the

rights of the respondent—where two undertakings had been given, one valid and the other invalid—to except to the sufficiency of the surety upon the last undertaking and, hence, we hold that the appeal was not perfected until five days after the filing of the second undertaking and that, since the transcript on appeal was filed within 30 days thereafter, it was filed in time.

The motion to dismiss the appeal is, therefore, denied.

---

## ON THE MERITS
(22 P. (2d) 325)

*S. J. Bischoff,* of Portland (H. V. Schmalz, of Burns, on the brief), for appellant.

*Blaine Hallock* and *Harold Banta,* both of Baker (Hallock, Donald & Banta, of Baker, on the brief), for respondent.

BAILEY, J. This suit was instituted on March 12, 1932, by the First National Bank of Burns, Oregon, and two other creditors of I. S. Geer & Company, a corporation with its place of business at Burns, Oregon, and hereinafter referred to as the Geer company, to have declared null and void a chattel mortgage executed by the Geer company in favor of Basche-Sage Hardware Company, hereinafter referred to as the hardware company, under date of November 23, 1931, and to enjoin a pending sale under said mortgage by the hardware company. This mortgage was on the goods, wares and merchandise constituting the stock in trade of the Geer company.

The defendant hardware company filed its answer denying certain allegations of the complaint, and a cross-complaint asking for the foreclosure of the chattel mortgage above referred to and another chattel mortgage executed by the Geer company to the hardware company, dated November 15, 1928, on the furniture and fixtures in the store of the Geer company, also for the foreclosure of a mortgage on real property in Harney county, Oregon, made and executed by I. W. Geer, hereinafter referred to as Waldo Geer, and Inez Geer, his wife, and given as security for the same indebtedness secured by the last mentioned chattel mortgage.

Thereafter, on March 18, 1932, the Geer company was adjudicated a bankrupt and later V. J. Benoe was elected and qualified as trustee in bankruptcy of the Geer company, a bankrupt. Upon the qualification of V. J. Benoe as such trustee, he applied for and obtained from the court permission to file an answer and cross-complaint, wherein he attacked the validity of the two chattel mortgages hereinbefore mentioned.

From the time of the filing of this answer and cross-complaint by the trustee in bankruptcy the only active parties to the litigation were the trustee and the hardware company, the defendant Geer company having defaulted and the creditors having sanctioned the trustee's continuing the proceedings instituted by them. A trial was had, resulting in a decree of foreclosure in favor of the hardware company, of the two chattel mortgages and the real estate mortgage.

The trustee in bankruptcy on this appeal does not question the validity of the real property mortgage, but asserts that the chattel mortgages were invalid as to the trustee. In his brief he states the reasons for his contention in the following language:

"(a) The chattel mortgages were not authorized by resolution of the board of directors.

"(b) The chattel mortgage on the stock of merchandise is void on the ground that it was made in trust for the mortgagor, in that:

"1. The mortgagor was allowed to remain in possession and to sell and dispose of the merchandise in the ordinary course of trade and to appropriate the proceeds therefrom to its own uses;

"2. The mortgage did not adequately provide for the payment of all proceeds of sales to the mortgagee;

"3. The mortgage did not provide for periodic and regular accounting by the mortgagor to the mortgagee;

"4. The mortgage did not adequately provide for periodic payment of the proceeds of sales by the mortgagor to the mortgagee;

"5. That subsequent to the making of the mortgage, mortgagee failed to insist upon and obtain regular or any accountings from the mortgagor at any time;

"6. That mortgagee permitted mortgagor to appropriate all the proceeds of sales to its own uses other than in liquidation of the mortgage indebtedness;

"7. The mortgagee permitted mortgagor to dispose of the mortgaged property to mortgagor's own uses other than the liquidation of mortgage indebtedness.

"(c) That the merchandise mortgage, being void from its inception, could not be validated by the abortive attempt to take possession prior to bankruptcy.

"(d) That the mortgage on the stock of merchandise is void as against the trustee in bankruptcy under the provisions of sections 60 and 67 of the bankruptcy act, in that it was a preference and made with intent to hinder, delay or defraud creditors.

"(e) That the mortgage on the fixtures is invalid in that it fails to adequately describe the personal property to be affected by the mortgage; it is established by the evidence that a great deal of the fixtures and equipment have been disposed of, and that a great deal of the fixtures and equipment in the hands of the trustee in bankruptcy were not in the possession of the mortgagor when the said mortgage was made in 1928".

The Geer company had been engaged in the retail hardware business at Burns for a number of years when in the summer of 1928 Waldo Geer, who was then the owner of some of the stock in said corporation, purchased from his father all the remaining outstanding shares of stock in the Geer company, with the exception of five shares which were retained by the father. Later, in the spring or summer of 1929, Henry Geer purchased from his brother Waldo some of the stock in said corporation, and from that time until the Geer company was adjudicated a bankrupt Waldo Geer, Inez, his wife, and his brother Henry owned all the outstanding stock in the corporation, with the exception of the five shares retained by the elder Geer and which he surrendered before the bankruptcy.

From the time that Waldo acquired the bulk of the stock of the Geer company, he was president and active manager of the company and Inez, his wife, was the secretary. When Henry Geer became a stockholder he was elected vice president of the corporation. These three constituted the board of directors.

For many years prior to the time it was adjudicated a bankrupt, the Geer company had purchased a substantial part of its merchandise from the defendant hardware company, which was engaged in the wholesale hardware business at Baker, Oregon.

On November 15, 1928, the Geer company was indebted to the hardware company on a note dated November 2, 1928, in the sum of $3,000, for merchandise purchased by the Geer company from the hardware company, and on November 15 it executed and delivered to the hardware company a chattel mortgage on the furniture, fixtures and equipment in its store. This mortgage was signed for the Geer company by Waldo Geer as president and Inez Geer as secretary, and bore an impression of the seal of the corporation. The acknowledgment to the mortgage stated that they were such officers and that they had affixed the corporate seal and signed said instrument on behalf of the corporation by authority of its board of directors. The mortgage was recorded on November 21, 1928.

The principal attack upon this instrument is that its execution was never authorized by the board of directors of the Geer company. The evidence disclosed that the minutes of the meetings of the board of directors of the corporation were in the possession of either Waldo Geer or the trustee in bankruptcy, and although demand was made for the production thereof by the hardware company, they were not produced at the trial.

There was no direct evidence, or any showing, from which the inference could be drawn that this mortgage was not authorized by the board of directors of the corporation.

■ Waldo Geer, the only one connected with the Geer company who testified concerning the execution of this instrument, stated that he did not know whether or not any resolution of the board of directors had been adopted authorizing its execution; that it was executed in good faith and for a recognized indebtedness; and that its validity had never been questioned prior to the bankruptcy proceedings. Moreover, the mortgage was admitted in evidence without objection. Since it recites that it was executed pursuant to a resolution of the board of directors, the presumption is that the execution of said mortgage was regular and that the ordinary course of business was followed in the execution thereof: § 9-807, subdivisions 19 and 20, Oregon Code 1930; *Wehrung v. Portland Country Club,* 61 Or. 48 (120 P. 747).

Practically all the reasons advanced by the trustee on this appeal for a reversal of the decree are directed to the alleged invalidity of the second chattel mortgage. This mortgage covered the existing and after-acquired stock in trade of the Geer company. It was dated November 23, 1931, but was not recorded until December 18 of the same year. It was given as further security for the payment of the $3,000 note secured by the first chattel mortgage and the real estate mortgage, also to secure a note for $2,000 dated December 15, 1928, and a note of $1,500 dated March 15, 1931. The notes are all signed on behalf of the corporation by Waldo Geer, president, and Inez Geer, secretary, with the exception of the first named note, which was apparently signed by Inez Geer individually

and not as an officer of the Geer company. The mortgage bore the corporate seal and was signed by the corporation by Waldo Geer, president, and Inez Geer, secretary, and acknowledged in the same form as the 1928 chattel mortgage.

The delay in recording this mortgage is accounted for by the fact that the $1,500 note which had been delivered to the hardware company in March, 1931, had not been signed by Inez Geer as secretary, and it was sent by the hardware company at Baker on November 27, 1931, to the Geer company at Burns, and not signed by Inez Geer and returned by the latter company for several days. There is no evidence that this mortgage was withheld from record by the hardware company for any reason other than to have the original note signed by Inez Geer before recording the mortgage, as the copy of the note attached to the mortgage bore her name as one of the signers and it was understood at the time the mortgage was executed that this note was to be signed by the secretary of the Geer company and returned to the hardware company. Within a day or two after the receipt of the note properly executed, the hardware company mailed the mortgage to the county clerk for filing.

That mortgage, dated November 23, 1931, contained the usual provisions as to default, payment of the notes, and prohibition against the sale or attempted sale of the mortgaged property by the mortgagor, except that the mortgagor was given authority to sell under the following conditions:

"It is further provided as a condition hereof that the mortgagor herein is permitted to sell from said stock of wares, goods and merchandise, in due course of trade, any part thereof, and from the gross receipts of the sale thereof, or any part thereof, shall be paid

the cost of maintaining and keeping up the present invoice of said stock of goods, wares and merchandise, to the present standard thereof, and for the purpose of paying the actual costs and expenses of conducting the said business, and the balance thereof, after keeping up said stock in trade to the present standard thereof, and paying the actual running expenses of said business, shall be applied upon the payment of said notes, whether or not any of said notes are matured, and the said mortgagor shall keep an accurate book account of all receipts and disbursements, so that the same can be readily posted at any time, in order to make the payments as herein provided, and the application of the net proceeds from the sale of said goods, wares and merchandise, and failure of said mortgagor, I. S. Geer & Company, a corporation, to comply with the terms hereof shall mature each and all of said notes, and render the mortgaged property covered thereby, subject to foreclosure and sale as herein provided''.

The mortgage also contained a provision that it might ''be foreclosed in the manner provided by law for the foreclosure of such chattel mortgages as do not provide within themselves the manner in which they are to be foreclosed, and the consideration of which does not exceed the sum of $500''.

It is contended by the appellant that the board of directors of the Geer company did not authorize the execution and delivery of the chattel mortgage dated November 23, 1931; that therefore the same was invalid; and that no rights were acquired thereunder by the hardware company. At the time this mortgage was executed all the stock of the Geer company, with the exception of five shares, was owned by Waldo Geer, Inez Geer, his wife, and Henry Geer, his brother, and these three constituted the board of directors. Waldo Geer was president, Henry Geer vice president, and Inez Geer secretary.

The mortgage was prepared at the instance of the hardware company and brought by Mr. French, credit manager of that company, to Burns for execution. Apparently Mr. French did not have any conversation with Henry Geer as to the execution of the instrument, but did discuss it at some length with Waldo Geer.

■ Although the minutes of the corporation were not produced, the evidence is clear that no formal resolution authorizing the execution of the mortgage was adopted. As the mortgage was signed by Waldo Geer as president and Inez Geer as secretary of the corporation, it must be assumed that they consented to its execution. It is maintained, however, by appellant that Henry Geer objected to and never consented to the execution of the mortgage.

Waldo Geer in testifying on direct examination, as a witness for the trustee, concerning this mortgage told about Mr. French's conversation with himself, and with reference to Henry Geer's attitude regarding the mortgage, gave the following testimony:

"So, I talked it over with Henry and Henry objected to it.

"Q. That is Henry Geer?

"A. Henry Geer, yes. Henry objected to giving the mortgage, but I told him I thought it was all right, that they wanted it and that Mr. French had told me that it would strengthen their credit in case they had to use it, so he said, well, he guessed it was all right. So, Mrs. Geer and I executed a chattel mortgage on the stock of merchandise".

He further stated that he talked it over with Henry, who objected to it, but that later Henry said he "guessed" it would be "all right" when he pointed out to him that it ought to be done.

On cross-examination Waldo Geer testified as follows:

"Q. Now, you have already told us that Henry agreed with you and your wife to the effect that it was proper for the corporation to give this mortgage that it gave to Basche-Sage Hardware Company on the twenty-third day of November, 1931?

"A. He agreed because it was incumbent on us to sign this mortgage.

"Q. Well, he agreed at any rate, didn't he?

"A. Yes, sir".

Henry Geer on direct examination as a witness for the trustee testified:

"Q. Will you state in the record, please, just what occurred at that time as far as you know, what conversation you had, and so on, and so forth?

"A. Well, Mr. French came over and talked to Waldo, my brother, about this mortgage. He never talked to me about it at that time, and Waldo spoke to me about the mortgage and I objected very strenuously to giving the mortgage, and I never did cease objecting to the mortgage, only as a matter of considering it absolutely necessary to give the mortgage in order to continue in business, and I remember the words I said to Waldo: 'If it is absolutely necessary to give that mortgage, I guess you will have to give it, but I would never give it' ".

During cross-examination he gave the following testimony:

"Q. As to the manner of executing the mortgage, as I understand it, you deferred to Waldo's position in view of the fact that he was the managing head of the organization?

"A. 'Deferred?' What do you mean by that?

"Q. Well, you felt his desire or attitude toward the matter would govern?

"A. I thought it was the only way out, that it was necessary. We had no alternative.

"Q. So you consented to the execution of the mortgage on that basis?

"A. I never consented to the execution of the mortgage.

"Q. You signed it?

"A. No, sir.

"Q. It was discussed with you?

"A. Yes, sir.

"Q. And as you said, you felt if Waldo thought it was necessary it was all right.

"A. I said if there was no way out, but I myself would never consent to it.

"Q. But you expressed your view to Waldo in the manner which you have indicated, if it had to be signed, to go ahead?

"A. Yes, sir".

It is apparent from the foregoing testimony and the record as a whole that the question as to the execution of this mortgage was discussed by Waldo and Henry Geer, and that although Henry stated that he never consented to giving the mortgage he did not strenuously object, under the circumstances, to the execution of it by the president and secretary on behalf of the corporation. His testimony must be considered in the light of his apparent hostility to the hardware company at the time of the trial. Moreover, it is not shown that the mortgage would not have been executed by the officers of the corporation, had Henry absolutely refused to consent to their executing it.

Henry Geer was only one of the three directors of the corporation and the other two had authority to execute the mortgage, even if Henry had positively refused to consent to its execution. The record shows that the business of the Geer company was conducted as a family affair; that very few, if any, meetings of the board of directors were ever held; that the busi-

ness of the corporation was transacted without holding directors' meetings; and that very few resolutions were adopted.

On February 25, 1932, the hardware company started to foreclose its mortgage by directing the sheriff of Harney county as its agent to take possession of the property covered by the mortgage. No objection was made by the Geer company or any of its officers to turning the mortgaged property over to this agent of the hardware company.

■ The trial court found that the Geer company, on November 23, 1931, duly made, executed and delivered this mortgage to the hardware company, and we concur in that finding.

Thompson on Corporations (3d Ed.), volume 2, § 1171 at page 599, in referring to the actions of directors of corporations, says:

"But it has been held that where directors own all the stock, they may take such action in relation to the disposition of the corporate property as they may see fit, and it is immaterial whether such disposition is made at regular directors' meeting or not. And where three or four trustees who managed the affairs of the corporation actively participated in the purchase of land, and the fourth had knowledge of the transaction, their authority to act could not be questioned by the corporation on the ground that they did not act as an official board but as individuals only. * * * However, where there are but a few interested in the management of a corporation, ordinary business may be transacted without the formality of resolutions. It may be done by conversations, without formal vote".

Today a large part of the business of the country is done by corporations, and all or most of the capital stock in many corporations is owned by a single individual, with the exception of the qualifying shares, or

by members of a family. The business of such corporations is conducted in much the same manner as any business owned by individuals, and formal meetings of the directors of many such corporations are seldom held.

In the case of *Vawter v. Rogue River Valley Canning Company,* 124 Or. 94 (257 P. 23, 262 P. 851), it is stated that as a general rule a corporation can act only through its board of directors at a regularly called meeting, but that there are exceptions to this rule and one of the exceptions is that of a corporation in which the directors own all the stock. The court, after citing numerous cases, there quotes with approval Thompson on Corporations (2d Ed.), § 1074, as follows:

"Another exception to this general rule requiring directors to act as a body, is shown in a case where the directors themselves owned all the stock of the corporation, and authorized the president to sell all the assets, and it was held that it was immaterial that such authority was not given at a regular meeting of the directors. Acquiescence by the stockholders in the action taken by directors separately, and where such action was carried out by the corporation, was held sufficient to render the acts valid".

In Fletcher's Cyclopedia of the Law of Private Corporations, volume 2, § 394, it is said:

"The necessity for directors to act as a board and at a meeting is based upon the ground that they are not authorized to act in any other way than by meeting and conferring, and not on the ground that they can not act in any other way; and the stockholders and the corporation, therefore, may be estopped to deny the validity of their action. For this reason, it has been held that the general rule does not apply where it is the custom or usage of the directors to act separately, and not as a board. The doctrine seems to be akin to

that of estoppel arising from a long course of dealing. In other words, 'a corporation, its board of directors and shareholders, may waive any necessity of a meeting of its board of directors for the transaction of the business of the company * * * "by permitting the directors to establish a habit or usage of assenting separately to the making and performance of contracts by their agents".   *   *   *,' ''

In § 395 of the same volume the following statement appears:

"If the directors own all of the stock, a conveyance, mortgage or contract authorized by them when not assembled at a meeting is valid, and the same rule applies where the directors in such a case are members of the same family but so at variance that directors' and stockholders' meetings are not held".

■ Moreover, it is not necessary that the actions of a board of directors be evidenced by written resolutions: *Markham v. Loveland,* 69 Or. 451 (138 P. 483) ; *Mann v. W. A. Gordon Co.,* 77 Or. 457 (151 P. 704).

The appellant asserts that the chattel mortgage dated November 23, 1931, is void "on the ground it was made in trust for the mortgagor". The reasons assigned in support of this contention have hereinbefore been quoted in full. Appellant's contention is based in a large measure upon the construction of § 63-506, Oregon Code 1930, which provides that:

"All deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods and chattels, or things in action, made in trust for the person making the same, shall be void as against the creditors, existing or subsequent, of such person".

The question is whether or not the mortgage was made for the use and benefit of the mortgagor or as security for the indebtedness of the mortgagor to the mortgagee. It is admitted that the Geer company at

the time of the execution of this mortgage was indebted to the hardware company in the sum of $6,500, evidenced by promissory notes, in addition to an open account of several hundred dollars. Shortly before demanding the execution of the mortgage, the hardware company had learned that the Geer company was not reducing its expenses as agreed and in keeping with the times. There is no evidence whatsoever that the mortgage was executed for any other purpose than to protect the mortgagee while permitting the mortgagor to continue in business. The mortgage itself did not require periodic reports to be made by the Geer company to the hardware company, but it did require the mortgagor to keep an accurate book account of all receipts and disbursements in such manner that the financial condition of the Geer company might be readily ascertained, and it required the net proceeds from the sale of the goods after paying operating expenses and keeping up the stock to be applied on the indebtedness to the hardware company.

*Currie v. Bowman,* 25 Or. 364 (35 P. 848), contains many features in common with the case at bar. The mortgage there under consideration covered the entire property of the mortgagor and provided for an accounting. At the time the mortgage was given the company was actively engaged in business, but the court found that it was probable, ''in the light of subsequent events, that it never was solvent and that its collapse was only a question of time''. The opinion held that ''it would be nothing more than ordinary business caution for him [the mortgagee] to secure himself against loss; and, if in so doing, he acted in good faith, the transaction was not fraudulent. It is only when the mortgage is given and received with the intent to hinder and de-

fraud creditors that it is void, and not when it is taken by the mortgagee for the honest purpose of securing a valid claim or indebtedness''.

In referring to the contention that the mortgage was invalid because it covered all the property of the mortgagor and gave the mortgagor power to sell, the court said:

"The mortgages contain no power of sale in the mortgagor for his own benefit, nor is there anything therein which the court can say is unlawful. The mortgagor is allowed to remain in possession of the goods, but he is required to keep a strict account, and pay over the proceeds, less the expenses of the business, to the defendant; and it is perfectly evident that by honest conduct under these mortgages there could be no fraudulent result. * * * We think, therefore, that the mortgages were valid, and constitute a lien on the property, and that the defendant is entitled to hold and retain the same and the moneys arising therefrom until the company's indebtedness to him is fully paid''.

In *Fisher v. Kelly,* 30 Or. 1 (46 P. 146), the mortgage was not filed for record, and the court held that the failure to file the same created a presumption of fraud as to the creditors of the mortgagor. Referring to a finding of fact that the mortgage had been locked in a safe and that the mortgagor had continued to do business as formerly without any change of possession, and was "doing business in all respects after the execution of the mortgage in like manner as before," the court said that this finding was probably equivalent to a statement that the mortgagor had disposed of the stock of goods for his own use and benefit, but that it did not appear from the finding that such disposal was in pursuance of any agreement between the mortgagor and the mortgagee, or that the mortgagee had knowledge of, consented to or ratified such action.

In *Sabin v. Wilkins*, 31 Or. 450 (48 P. 425, 37 L. R. A. 465), after discussion of several preceding decisions of this court on this subject, it is said:

"In a later case (Currie v. Bowman, 25 Or. 364 [44 Am. & Eng. Corp. Cases 662], 35 Pac. 848), it was held that a chattel mortgage is valid which by its terms permits the mortgagor to retain possession with power to sell, but which requires him to account to the mortgagee for the proceeds less expenses of sale. These cases indicate very fairly the policy and trend of the law in this state in so far as it is involved by the facts before us".

The court then states that the purpose of the parties in giving and receiving the mortgage is a test of its validity at its inception, but that the same is subject to modification, either express or implied; that it is a prerequisite to its continuing validity that good faith and fair dealing be maintained toward those whose interests are affected by it; and that by subsequent treatment a mortgage valid at its inception may be rendered invalid. "But," the opinion continues, "where the mortgage has been seasonably and duly filed, want of good faith must be established by the party who attempts to overthrow it, as the presumption stands in favor of honesty and fair dealing".

In the later case of *Greig v. Mueller*, 66 Or. 27 (133 P. 94, 46 L. R. A. (N. S.) 722), the trustee in bankruptcy brought a suit to have declared void a mortgage executed by the bankrupt to Mueller for the benefit of two banks. In that instance neither of the banks had requested that the mortgage be given. One of the banks did not agree to accept it, but the other bank stated that it was willing to accept the mortgage, if it was of any benefit to the mortgagor. The court held that the facts as above outlined showed a fraudulent purpose on the part of the mortgagor which was acquiesced in by the

bank which agreed to accept the mortgage. The opinion, however, proceeded with the following statement:

"This court has recognized that by agreement or provision in the mortgage the mortgagor may remain in possession of the stock of goods and continue to make sales, strictly accounting to the mortgagee for the proceeds of the sales less the expense of making the sales; but by agreement and connivance in disregard of the terms of the mortgage Ford was permitted to use it to ward off his creditors, and yet to proceed to use the goods exclusively for his own benefit without paying the mortgage debt therefrom".

In the case of *Etheridge v. Sperry*, 139 U. S. 266 (11 S. Ct. 565, 35 L. Ed. 171), it was held that a mortgage on a stock of goods, which contained no reservation for the benefit of the mortgagor and was only for the security of the mortgagee, and which gave to the mortgagee full power to take possession upon default in payment, was not invalidated by the fact that there was an understanding at the time of its execution that the mortgagor might use the proceeds of his daily sales to support himself and keep up the stock by purchases, applying the surplus to the payment of the mortgage debt. In referring to several prior decisions by that court, it was said that it was clearly recognized in those decisions that such an instrument was valid notwithstanding a stipulation that the mortgagor might sell the goods at retail. "What was meant," said the court, "was that such an instrument should not be used to enable the mortgagor to continue in business as theretofore, with full control of the property and business, and appropriate to himself the benefits thereof, and all the while holding the instrument as a shield against the attack of unsecured creditors". It was further observed:

"The law now generally requires a record of all such instruments, and that, like the recording of a real

estate mortgage, gives notice to all parties interested of the fact and extent of incumbrances. Why should a transaction like this be condemned, if made in good faith and to secure an honest debt?  *  *  *  The interests of the general public are not prejudiced by any such transaction between debtor and creditor. Indeed, they are rather promoted by any arrangement under which the mortgagor can continue in business, for in ninety-nine cases out of a hundred the taking of possession by a creditor results in closing the business, and turning the debtor out of employment. The only parties who can claim to be injuriously affected are unsecured creditors. But they are notified by the record of the exact relations between the mortgagor and mortgagee; and surely subsequent creditors have no right to complain if they deal with the mortgagor with full knowledge of such relations.  *  *  *  The fact that fraudulent relations are possible, is hardly a sufficient reason for denouncing transactions which are not fraudulent''.

''The statute'', said the court in the case of *Delaney v. Valentine,* 154 N. Y. 692 (49 N. E. 65), in referring to a statute somewhat similar to the one relied upon by the appellant here, ''was intended to cover only passive trusts for the exclusive use of the grantor, or where the use to the grantor is its chief purpose, and has no application to trusts which are only incidental, and are expressed, or result, to the use of the grantor after the exercise of the primary purpose, which is lawful''.

Although there was some hostility against the hardware company shown at the trial by certain officers of the Geer company, there was no intimation by them that there was any collusion between themselves and the hardware company relative to the execution of the mortgage. Nor did they claim that the mortgage was

executed for their benefit or that it was anything other that it purported to be, i. e., security for the indebtedness owing the hardware company.

The chattel mortgage of November 23, 1931, was not a transfer in trust for the Geer company. It was a *bona fide* transaction between the mortgagor and the mortgagee and given by the former as security for its indebtedness to the latter. There was no attempt to cover up the mortgagor's property so as to defraud its other creditors or to make it appear otherwise than as stated in the mortgage. As evidence of the fact that the hardware company was not attempting to hinder, delay or defraud the other creditors, was its expressed desire that the mortgagor pay the $1,000 due to the bank and discharge the small amounts which it owed for purchase of goods from other creditors, before paying the hardware company.

It would seem that the defense that the mortgage was not authorized by the directors of the Geer company and that coercion was used in procuring the officers' signatures thereto is inconsistent with the contention that the mortgage was given for the sole use and benefit of the mortgagor.

The chattel mortgage on the stock of goods was not invalid because it did not require the mortgagor to make periodic reports to the mortgagee. It did require the mortgagor to keep a strict account of its affairs, so that the actual financial condition of the concern could be easily ascertained. The mortgage was filed for record on December 18, 1931, and in the same month the mortgagor sent the hardware company $500 on account. This was an indication that the Geer company was complying with its agreement. There is no evidence in the case to the effect, or from which an inference could be drawn, that the mortgagee aban-

doned or waived the requirement of a strict accounting on the part of the mortgagor.

■ The chattel mortgage of November 23, 1931, stipulated that the mortgage might "be foreclosed in the manner provided by law for the foreclosure of such chattel mortgages as do not provide within themselves the manner in which they are to be foreclosed, and the consideration of which does not exceed the sum of $500". Upon the breach of the conditions of the mortgage the hardware company, on or about February 25, 1932, gave written instructions to C. W. Frazier, sheriff of Harney county, Oregon, to take possession of the property covered by said mortgage and sell the same in the manner therein provided. Acting under this authority, Frazier did take possession of all the stock in trade of the Geer company, and on or about March 2, 1932, posted notices of sale of the said property.

The appellant contends that, since such procedure as to foreclosure was not authorized by law, the mortgage is void, and "the taking of possession by the sheriff was a nullity". In support of this contention, appellant cites and relies upon the case of *Pittock v. Jordan,* 19 Or. 7 (13 P. 510). In that instance the mortgage provided that in default of payment Tatum & Bowen might take possession of the mortgaged property and dispose of it as they deemed best. Instead of selling the property themselves, they instructed the sheriff to do so, and when proceedings were brought against him the sheriff contended that he was acting in his official capacity under the direction of Tatum & Bowen. The court held, however, that he was a mere intruder, "and his official character could be no protection to him whatever".

The evidence in the case at bar is to the effect that the sheriff of Harney county took possession of the

property, not in his official character but as agent for the mortgagee. Moreover, no objection was made at the time Mr. Frazier took possession of the property on that account, and it appears that both the mortgagor and the mortgagee considered this provision of the instrument valid.

Later, when the receiver for the bankrupt company was appointed, Frazier relinquished the property to the receiver without the consent of the hardware company, and it is contended that any advantage which might have been gained by taking possession of the property was lost when, as appellant contends, Frazier voluntarily turned the same over to the receiver. The evidence does not show that the property was voluntarily surrendered to the receiver, but that Frazier, upon being notified by the receiver of the latter's appointment, considered it his duty to turn over the property to the receiver.

■ The provision in the mortgage as to the sale of the property did not render that instrument invalid, and when Frazier took possession of the personalty he did so as agent of the hardware company and not in his official capacity as sheriff of Harney county.

■ In the case of *Kenney v. Hurlburt*, 88 Or. 688 (172 P. 490, 173 P. 158, Ann. Cas. 1918E, 737, L. R. A. 1918E, 652), it is stated that where the mortgage was upon a fluctuating stock of goods the lien became perfected when the mortgagee was put in possession of the merchandise, and that the mortgage operated as an executory agreement, which subjected the after-acquired goods to the lien of the mortgage upon the mortgagee's taking possession of the same.

It is contended, however, by the appellant here, that this statement by the court was not material to the

decision in the case and therefore is not controlling here. This court has re-examined the many authorities cited in the opinion in support of the foregoing statement and is satisfied that the proposition of law therein stated is sound. See in this connection, *First National Bank v. Wegener,* 94 Or. 318 (186 P. 41), *Wiggins Co., Inc., v. McMinnville Motor Car Co.,* 111 Or. 123 (225 P. 314), and *Ruth v. Cox,* 134 Or. 200 (291 P. 371).

■ The hardware company as mortgagee took possession of the stock of goods, as already stated, on or about February 25, 1932, and the petition in bankruptcy was not filed until March 18 of the same year. When the receiver appointed for the bankrupt and, later, the trustee, took possession of the stock of goods they did so with the knowledge of the rights of the hardware company, and their rights to the property were subordinate to the prior lien of the hardware company. The trustee, therefore, is not in a position to urge the invalidity of the mortgage on the ground that the same was on a fluctuating stock of goods: *Wiggins Co., Inc. v. McMinnville Motor Car Co.,* supra; *Teshner v. Roome,* 106 Or. 382 (210 P. 160, 212 P. 473); *Credit Service Co. v. Furney,* 128 Or. 21 (271 P. 738); *In Re Pine Tree Lumber Company,* 269 Fed. 515.

The appellant further asserts that the mortgage dated November 23, 1931, constituted a preferential incumbrance and hence was void under subdivisions a and b of § 60 of the bankruptcy act (Title 11, § 96, U. S. C. A.). In order to discuss this matter it will be necessary to refer briefly to the facts in the case.

The Geer company was incorporated with a capital stock of $25,000, of which $20,000 was subscribed and

outstanding. Waldo Geer purchased his father's stock in the corporation in the summer of 1928, paying therefor the sum of $7,200, which he had paid in full at the time of the bankruptcy, out of his salary from the corporation.

A statement of the assets and liabilities of the corporation as of January 1, 1931, was prepared and mailed to the hardware company shortly after the first of that year. This statement was as follows:

"Merchandise Inventory .................................. $14,882.16
Accounts receivable .............................................. 8,952.71
Cash on hand ..................................................... 1,415.92
Warehouse ............................................................ 916.00
Equipment ......................................................... 2,021.30

$28,188.09
Mortgages, notes and Receivable [Payable]   8,350.60

Balance, $19,837.49
Balance 1/1/30, $17,317.74
No accounts receivable [payable] past due.
        "Statement I. S. Geer & Co., by I. W. Geer".

It is conceded by all parties interested that the word "receivable" should be "payable" in the two instances above noted.

On February 16, 1932, another statement was rendered by the Geer company which showed the assets of the corporation as amounting to $25,269.82, of which amount $12,227.17 represented merchandise, $9,125.11 accounts receivable, and $3,133 equipment. The same statement showed the liabilities of the corporation to be $11,276, of which amount $8,229.21 represented indebtedness to the hardware company, $6,500 on notes and the remainder on open account. Also included with the liabilities was a note of $1,000 in favor of the First National Bank of Burns.

The Geer company was a well-established corporation, and Waldo Geer testified that the fact that it was a going concern at the time of the execution of the mortgage was "of decided value". He further testified that the value of the merchandise on November 23, 1931, was about $13,000 and that the statements when prepared were made to reflect, to the best of his judgment, the true condition of the business.

For the year 1931 Waldo Geer drew a salary of around $3,400; his wife, between $400 and $500; and Henry, approximately $3,400. At or about the time the mortgage was given there were two insurance policies on the merchandise, one for $11,000 and another, which was about to expire, for $3,000.

Mr. Hindman, a salesman for the hardware company, took an inventory of the Geer company's stock of goods at the time the hardware company took possession under its mortgage, and found the value of stock on hand to be around $10,000, which included merchandise at first thought to be consigned but later found to belong to the Geer company. In taking this inventory the wholesale price at Baker, Oregon, of the merchandise purchased from the hardware company was used, such merchandise being a substantial part of the stock. Cost of freight thereon to Burns was not considered. On the balance of the stock the code maintained by the Geer company showing prices paid by it for merchandise was followed. Some of the goods were "lumped" and a fair value given them.

Waldo Geer stated that during all the time the company was in business, up to February 1, 1932, its assets exceeded its liabilities. He further testified that, with the retrenchment in expenses planned for 1932, the company could have made a profit of at least

$1,000. At the time the schedule of assets was filed in the bankruptcy proceeding he placed the value of stock in trade around $10,000, which amount he thought was too low. In the statement furnished the hardware company under date of February 16, 1932, the accounts receivable were listed by the Geer company at $9,-125.11, but the accounts receivable turned over to the trustee were listed at $3,806.97. The shrinkage was not satisfactorily explained. Some of the accounts were used to cancel indebtedness which the Geer company owed those against whom accounts stood. Others were used to pay the individual indebtedness of Waldo Geer and were said to be charged against his past salary.

The decision of the Circuit Court of Appeals for the Fourth Circuit in *Everett v. Warfield Mining Co.*, 37 Fed. (2d) 328, is in point here. In referring to the question of insolvency and the shrinkage of assets, the opinion says:

"There is no direct evidence of insolvency at that time, and the contention to that effect is based upon the fact that certain assets later became or proved to be worthless. Bankrupt had been chartered in 1921. In 1922 it had valuable contracts for the purchase and sale of coal; and, on the strength thereof, had set up on its books an item of $10,000 as good will. Counting this as an asset, an audit of its books on September 30, 1922, showed assets of $208,415.33, which amount was approximately $45,000 in excess of liabilities. It is not shown that any losses were sustained between the date of this audit and the payment in question; but insolvency is arrived at by charging off this $10,000 item of good will and accounts alleged to be worthless, amounting to $57,000. Of this $57,000, however, $30,-000 was owing by the Southern Elkhorn Company, which at the time of the payment was a going concern, making regular deliveries of coal under its contract with bankrupt. It became bankrupt some time later; but at the time in question there was nothing which

would have justified treating the amount which it owed as a worthless debt. The remaining $27,000 of bad accounts were not found to be worthless until some time after the bankruptcy. It is clear that the solvency or insolvency of the bankrupt, for the purposes of this case, must be determined as of the time when the alleged preferential payment was made; and, in determining this, we must value the assets at what they were reasonably worth at that time, not upon the basis of what they turned out to be worth some time later, after bankruptcy had supervened. Rutland County Bank v. Graves (D. C.), 156 F. 168.

"But, even if it be conceded that bankrupt was insolvent at the time of the payment, we agree with the learned judge below that there is nothing to show that appellee or its officers had reasonable cause to believe then that it was insolvent, or that the payment would be a preference. They testify positively that they had no reason to believe that bankrupt was insolvent at that time; and there is nothing in the record to contradict their testimony or impeach their good faith. On the contrary, the testimony tends to corroborate their statement. They knew that the audit, taken less than two months before, showed an excess of assets over liabilities of $45,000".

After discussing other matters and the fact of an attachment against the property of the bankrupt, the court observed:

"It is probably true that, because of the attachment of so much of bankrupt's funds, appellee apprehended that bankrupt would be embarrassed and delayed in meeting its obligations, and that appellee was anxious to get the $16,000 payment for this reason; but this falls far short of having reasonable cause to believe that bankrupt was insolvent and that the payment would effect a preference. A creditor may feel anxious about his claim and have a strong desire to secure it or have it paid, and yet not have such belief as the act requires. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by the law. Stucky v. Masonic Savings Bank,

108 U. S. 74, 2 S. Ct. 219, 27 L. Ed. 640; Grant v. First National Bank, 97 U. S. 80, 24 L. Ed. 971; Collier on Bankruptcy (13th Ed.), vol. 2, p. 1307. As said by Judge Learned Hand in Kennard v. Behrer (D. C.), 270 F. 661, 664, 'that creditor only the statute proscribes who dips his hand in a pot which he knows will not go round.' See, also, Manly v. Southern Supply Co. (C. C. A. 4th), 14 F. 273) ''.

Compare, also, *Doolittle v. Robinson,* 105 Or. 163 (206 P. 229), *Homan v. Hirsch,* 106 Or. 98 (211 P. 795), *Sitton v. Peyree,* 117 Or. 107 (241 P. 62, 242 P. 1112), and *Wiggins Co., Inc. v. McMinnville Motor Car Co.,* supra.

■ The trustee has failed to prove that the Geer company on November 23, 1931, at the time of executing the mortgage, was insolvent, or that the mortgage resulted in a preference in favor of the hardware company. Both Waldo Geer and the credit manager of the hardware company stated that the Geer company was solvent in November, 1931. Moreover, the facts tend to show that the Geer company was then solvent; that no preference in favor of the hardware company was intended or in fact resulted; and that the hardware company did not have reasonable cause to believe that a preference would result through execution of the mortgage.

It is further contended by appellant that the mortgage under discussion is void under § 67 of the bankruptcy act (Title 11, § 107, U. S. C. A.). In support of this contention it is asserted by appellant that this mortgage covered all the assets of the Geer company, and based upon this assertion it is maintained that the taking of the mortgage rendered the corporation insolvent.

The statement furnished in January, 1931, by the Geer company to the hardware company showed ac-

counts receivable amounting to almost $9,000, which Waldo Geer stated represented, when compiled, as far as he could ascertain it, the true condition of the Geer company. The evidence is insufficient to show what the amount of the accounts receivable or the value thereof was in November of the same year, although it shows that they were estimated at the time of the trial to be of much less than face value.

The mortgage was given to the hardware company with the understanding that the Geer company was to pay off the indebtedness to the bank, $1,000, and to pay cash for merchandise bought elsewhere, before paying the hardware company on account. The latter company was to, and did, continue thereafter to supply the Geer company with merchandise on open account.

In *Doolittle v. Robinson,* supra, this court explains the distinction between § 60-b and § 67-e of the bankruptcy act in the following language:

"Section 67-e contains the element of four months prior to the filing of the petition. The expectancy of preference does not enter into the calculations under that section, but the paramount factor therein is the intent of the bankrupt to hinder, delay or defraud his creditors. * * *

"In short, as between sections 60-b and 67-e the former is controlled by the possession of reasonable cause on the part of the transferee to believe that a preference would be effected. And in section 67-e the mental attitude of fraudulent intent on the part of the bankrupt is the controlling factor".

The evidence does not disclose any intent on the part of the bankrupt to hinder, delay or defraud its creditors, nor on the part of the hardware company to defraud the creditors of the Geer company. See, also, *Sitton v. Peyree,* supra, and other cases cited on the preceding point.

■ As a further assignment of error it is stated by appellant that the court erred in holding that the mortgagee had a valid lien upon the fixtures and equipment of the Geer company, due to the fact that the mortgage of November 15, 1928, did not cover after-acquired property. It appears from the evidence that the checkwriter, adding machine and typewriter covered by said mortgage were traded in for new equipment, with an allowance made on the old equipment in the exchange; that certain fixtures were altered and changed; and that other fixtures had been entirely removed and replaced by new fixtures. No authority, apparently, had been procured from the mortgagee for the exchange of equipment or the alteration or removal of fixtures. Waldo Geer testified that he always considered that new equipment and fixtures as acquired were covered by the mortgage. When foreclosure of the mortgage was started by the hardware company, the fixtures and equipment were delivered to the mortgagee and were in the possession of its agent at the time of the bankruptcy proceedings. It may well be said that under the circumstances it was the understanding of the parties that this substitution was to be made, and under the authority of *Ruth v. Cox,* 134 Or. 200 (291 P. 371), we hold that this mortgage covered the new equipment and fixtures, and that under authorities hereinabove cited the taking possession of the same by the mortgagee made its lien thereon good as against the trustee in bankruptcy.

No error was committed by the circuit court, and the decree appealed from is affirmed.

ROSSMAN, BEAN, and CAMPBELL, JJ., concur.