Edwin C. EBERLY and Elsie Eberly, Husband and Wife, Appellants,

v.

Frank A. DUDLEY, as Trustee of the Estate of DuVall's, Inc., Bankrupt, Appellee.

No. 17758.

United States Court of Appeals
Ninth Circuit.

Dec. 11, 1962.

S. J. Bischoff, Portland, Or., and Pat H. Donegan, Burns, Or., for appellants.

Boyrie & Miller, F. Brock Miller and Boyd J. Long, Portland, Or., for appellee.

Before CHAMBERS, MAGRUDER and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

This is an action by a trustee in bankruptcy to recover the value of property alleged to have been received by defendants as a preferential transfer, voidable under section 60 of the Bankruptcy Act (Act), 11 U.S.C. § 96. Judgment in the sum of $17,000 was entered for plaintiff and defendants appeal.

The district court found and concluded that there was a transfer by the bankrupt to appellants at a time when the bankrupt was insolvent, that the transfer was preferential, and that appellants had reasonable cause to believe that the bankrupt was insolvent at the time the transfer was made. Accordingly the transfer was adjudged voidable under section 60 of the Act. Appellants challenge each of these findings and conclusions.

The basic facts are not in dispute. On October 9, 1957, Edwin C. Eberly and his wife, Elsie Eberly, sold to DuVall's Inc., the bankrupt, a variety store at Burns, Oregon. Included in the sale were the stock of merchandise and fixtures.

The purchase price was $43,700, of which DuVall's paid $10,000 cash. The balance of $33,700 was covered by a purchase money note payable in seventy-two monthly installments. This note was secured by a chattel mortgage on the assets sold and on after-acquired merchandise purchased to replace merchandise sold. The mortgage contained a covenant prohibiting the mortgagor from selling or delivering the mortgaged property to a third party. It also gave the mortgagee a right of possession on breach of covenant or default in performance of any terms.

The note and chattel mortgage were delivered on October 9, 1957, which was the day of sale. On the same day the mortgage was duly recorded in the records of Harney County, Oregon. DuVall's went into immediate possession of the variety store and in the operation of that business sold merchandise at retail and purchased merchandise to replenish the stock.

DuVall's failed to pay the 1959–60 personal property taxes on this property, in the sum of $301.57, prior to delinquency, and failed to pay 1960–61 taxes in the sum of $821.45 which were due November 15, 1960. DuVall's also permitted the fire insurance upon the fixtures and stock to expire on October 1, 1960, and failed thereafter to obtain fire insurance policies on said assets. The last installment payment on the note was made on November 9, 1960, at which time there was an unpaid balance of $20,105.07, payments then being somewhat in arrears.

For some time Sprouse-Reitz Co., Inc., a variety store chain, had endeavored to buy DuVall's store. On November 8, 1960, it was agreed that Sprouse-Reitz would buy for inventory at retail less thirty-five per cent, plus $5,000 for the fixtures. Crews employed by the two companies completed an initial inventory listing on Sunday, November 13, 1960. A set of keys was given to Vern Hoare, a Sprouse-Reitz representative, on that day.

Mr. DuVall and Donald M. Whaley, a representative of Sprouse-Reitz, were both present when the store opened for business on Monday morning, November 14. About noon of that day DuVall left, his manager Kathryn Hauth, remaining behind.

In the meantime, on November 12, the Eberlys had heard a rumor that DuVall's was attempting to sell the store. On Monday afternoon, November 14, Mr. Eberly called at the store to verify the rumor. DuVall had already left, but Mr. Whaley confirmed the rumor and stated that he was to run the store pending compliance with the Oregon bulk sales law.

Tuesday morning, November 15, Mr. Eberly demanded possession of the property from Sprouse-Reitz on the ground that default was made in the payment of an installment and that the sale and

delivery to Sprouse-Reitz was in violation of the covenant in the mortgage. Sprouse-Reitz delivered the keys, and possession of the property, to Eberly at that time. All of the merchandise on hand which then came into the possession of the Eberlys was after-acquired merchandise within the meaning of the mortgage referred to above.

Thereafter, the Eberlys foreclosed the mortgage in the manner provided for therein, sold the property, and applied the proceeds to the satisfaction of the mortgage debt. On November 22, 1960, the petition in bankruptcy was filed. After DuVall's was adjudicated a bankrupt an investigation disclosed that the company had been insolvent on November 14, 1960.

In order to hold that there was a transfer by the bankrupt to appellants it was necessary for the district court to find and conclude that when appellants obtained possession on November 15, 1960, title in the store and its stock was still in DuVall's, and had not passed to Sprouse-Reitz. The court did so find and conclude. Contending that this was error, appellants argue that on November 15, 1960 the sale to Sprouse-Reitz had already been consummated.

The procedure to be followed in consummating the sale was specified by Sprouse-Reitz. It included the taking of an inventory and compliance with the Oregon bulk sales law, ORS 79.010–040. Delivery of a bill of sale containing certain warranties and the prorating of personal property taxes were also specified as prerequisites of the closing.

Except for minor errors to be adjusted, the inventory had been completed before November 15, 1960, and a representative of Sprouse-Reitz was on the premises while business was being carried on. It is not clear in the record, however, that the store was then being run only for the benefit of Sprouse-Reitz. While Mr. DuVall had left by then, DuVall's manager, Kathryn Hauth, who had a set of keys, remained on the premises until November 17, 1960.

In any event, the parties had not complied with the Oregon bulk sales law, which required that notice of the impending sale be given each creditor of DuVall's by telegram or registered letter at least five days before the consummation of sale. Nor had there been a delivery of a bill of sale, a prorating of personal property taxes, or the payment of any consideration by Sprouse-Reitz.

Assuming that the contract between DuVall's and Sprouse-Reitz was one to sell specific or ascertained goods, the property in them would transfer to Sprouse-Reitz at the time the parties intended it to be transferred. ORS 75.180. We are convinced that the finding of the district court that the parties intended the title to pass only upon completion of all the procedures specified by Sprouse-Reitz, is not clearly erroneous. We base this conclusion not only upon a consideration of all the evidence, which affirmatively discloses such an intent, but also upon the fact that implicit in a contrary ruling would be a finding that DuVall's and Sprouse-Reitz intended to engage in a fraudulent transfer.[1]

We hold that the district court did not err in finding and concluding that the transfer of the store and stock of goods was made by the bankrupt to appellants.[2]

---

1. Since the Oregon bulk sales law had not been complied with by November 15, 1960, a consummation of the DuVall's sale to Sprouse-Reitz on or before that date would be conclusively presumed to be fraudulent as to any creditors who had not received notice of the sale. ORS 79.-020.

2. It would appear that in the long run, appellants would gain nothing were we to reach the opposite conclusion. Such a conclusion could only be on the ground that title had passed from DuVall's to Sprouse-Reitz before appellants gained possession. In that event, however, the transfer to Sprouse-Reitz would be conclusively presumed fraudulent, and therefore voidable by the creditors of DuVall's, because of non-compliance with the Oregon bulk sales law. Since appellants would not, under the circumstances, be bona fide purchasers from Sprouse-Reitz,

Appellants further argue that if there was a transfer of this property from DuVall's to appellants, it should be deemed to have occurred, not on November 15, 1960, but more than four months before the filing of the petition in bankruptcy. If this is true the district court erred in holding this transfer to be a preference, since, by definition, only transfers made within four months before the filing of the petition in bankruptcy may be so regarded. See section 60, sub. a(1) of the Act, 11 U.S.C. § 96, sub. a(1).

Under section 60, sub. a(2) of the Act, 11 U.S.C. § 96, sub. a(2), a transfer of personal property is deemed to be made when it becomes so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee. In determining what the circumstances must be in order for a transfer to reach this state of perfection, state law governs. See McKenzie v. Irving Trust Co., 323 U.S. 365, 370, 65 S.Ct. 405, 89 L.Ed. 305.

Our inquiry then, is what priorities obtain according to Oregon law, between one who holds a recorded mortgage on after-acquired property but has not taken possession of the property, and a subsequent lienholder whose lien is founded on a simple contract. If it is necessary for the mortgagee to take possession of the property in order to prevail over such a lienholder, that is the end of the matter. Under these circumstances the transfer would be deemed to have been made when appellants took possession of the property. Since in our case possession was taken within the four-month period before the petition in bankruptcy was filed, the transfer would have to be set aside as preferential if appellants had reasonable cause to believe that the bankrupt was insolvent when they took possession.

Appellants have not cited and we have not found any cases in which the Oregon court has adjudicated the relative priorities of an after-acquired mortgagee who has not taken possession and a lienholder whose claim arises out of a simple contract. Appellants urge, however, that if faced with that problem the Oregon court would be constrained by its past decisions to hold in favor of the mortgagee. This argument is bottomed on either of two alternate theories.

The first of these theories, and the one which we first discuss, is that the chattel mortgage lien on after-acquired property, although equitable when the mortgage is executed, attaches and becomes a legal lien as soon as the property is acquired by the mortgagor. We have examined every case that appellants cite as authority for this proposition. None of them support it. Rather, the Oregon court has adopted the general rule that when a chattel mortgagor acquires property described in a chattel mortgage purporting to include after-acquired property, only an equitable lien comes into existence. A legal lien is not perfected until the mortgagee takes possession.

Appellants argue further, that even if the holder of an after-acquired mortgage must take possession in order to perfect a legal lien, in Oregon recordation of a chattel mortgage is the equivalent of or a substitute for possession. Since the chattel mortgage in our case was recorded on the same day that it was executed, it is argued, and since recordation is the equivalent of taking possession, appellants had perfected a legal lien on the property without having taken possession.

Davis v. Bowman, 25 Or. 189, 35 P. 264, decided in 1894, and Nicklin v. Betts Spring Co., 11 Or. 406, 5 P. 51, decided in 1884, are cited by appellants in support of their view that recordation is equivalent to taking possession for the purpose of perfecting the legal lien of a chattel mortgage. Both of these early cases, dealing with a statute which was

---

for value, the creditors of DuVall's could then have pursued their remedies under

the bulk sales laws against appellants as well as Sprouse-Reitz.

repealed in 1893,[3] contain language to the effect that the filing of a mortgage takes the place of a change of possession.

We need not determine whether these decisions were ever authoritative with regard to the recordation of a mortgage on after-acquired property, for at least they are not authoritative at this time. Under present Oregon law, the lien of a chattel mortgage on future acquired merchandise becomes an equitable lien not earlier than the time when the property is acquired by the mortgagor and a legal lien when possession of the same is taken by the mortgagee.[4] Recordation is not an effective substitute for possession by the mortgagee in determining whether a legal lien has come into existence.[5]

Appellants' second and alternate theory is that even if a recorded mortgage on after-acquired property results in only an equitable lien, recordation provides sufficient constructive notice for the equitable lien to prevail over the claims of third parties in Oregon.[6] But the Oregon court has indicated so strongly that recording a mortgage on a shifting stock of goods does not constitute constructive notice that we must reject this argument.[7]

Another line of argument advanced by appellants is that taking possession for the purpose of foreclosure within four months of bankruptcy, by virtue of a right created by a chattel mortgage on after-acquired property, is not a preferential transfer if the mortgage was executed for a new and contemporaneous consideration and was recorded prior to the four-month period.

Appellants cite Porter v. Searle, 10 Cir., 228 F.2d 748, in support of that view. Porter arose under the law of Utah, which the court stated at page 751 to be as follows:

"Under the laws of Utah, a lien acquired by legal or equitable proceedings on a simple contract is subject to prior and valid legal and equitable liens * * *."

If the mortgagee has perfected his lien against all subsequent lien creditors prior to the beginning of the four-month period, then of course his taking of possession would not be a further act of perfection, and consequently not a transfer within the meaning of section 60. But in our case, as we have indicated, under

---

3. The repealing statute is Laws 1893, p. 30. See reporter's note on 25 Or. 189.

4. Wochnick v. True, 224 Or. 470, 356 P.2d 515; Turner v. Dobson, 169 Or. 362, 127 P.2d 746; First National Bank of Burns v. Frazier, 143 Or. 662, 19 P.2d 1091, 22 P.2d 325; Kenney v. Hurlburt, 88 Or. 688, 172 P. 490, 173 P. 158, L.R.A. 1918E, 652.

5. Wiggins v. McMinnville Motor Car Co., 111 Or. 123, 225 P. 314; Kenney v. Hurlburt, note 4, above.

6. This argument and the preceding argument by appellants assumes that all of the after-acquired property which was acquired by them on November 15, 1960, came into the possession of DuVall's more than four months prior to the filing of the bankruptcy petition. In view of the conclusion we have reached, we need not decide whether the record supports this assumption.

7. E. g., in Wiggins Co., Inc. v. McMinnville Motor Car Co., 111 Or. 123, 130, 225 P. 314, 316, the court said:
   "* * * The question seems to be pretty well settled in this state that a chattel mortgage upon a fluctuating stock of merchandise is void as to creditors where possession is not taken and where the mortgage professes to include in its terms after-acquired goods as well."
   And in Kenney v. Hurlburt, 88 Or. 688, 697, 172 P. 490, 493, the court said:
   "* * * Although the chattel mortgage * * * was invalid as against the creditors of the mortgagor, it being upon a fluctuating stock of goods, the lien was thereby perfected when the mortgagee * * * was put in possession of the merchandise * * *. The mortgage operated as an executory agreement which subjected the after-acquired goods to the lien of the mortgage upon the mortgagee taking possession of the goods before the rights of third persons intervened. * * *"
   In both cases the mortgages under discussion had been duly recorded.

Oregon law the mortgagee of after-acquired property must take possession in order to fully perfect his lien against subsequent lien creditors. Thus appellants' taking of possession was an act necessary to the full perfection of their lien, and since it occurred within the four-month period it constituted a preferential transfer within the meaning of section 60.

In further support of this particular contention appellants also cite Thompson v. Fairbanks, 196 U.S. 516, 25 S.Ct. 306, 49 L.Ed. 577; First National Bank v. Frazier, 143 Or. 662, 19 P.2d 1091, 22 P.2d 325, and other cases for the proposition that if an executory agreement created an equitable lien upon property, a later taking of possession of the property would relate back and perfect the lien as of the original date of the agreement.

██ This doctrine of relation back developed in the cases prior to the 1938 Act. The latter Act, particularly section 60, sub. a(2), 11 U.S.C. § 96, sub. a(2), represents an abandonment of the relation-back concept. Thereafter the preferential character of a transfer was required to be considered as of the time when the last act was done which was necessary under state law to perfect the transfer against bona fide purchasers and creditors of the transferor. See Corn Exchange Nat. Bank v. Klauder, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884; and 3 Collier, Bankruptcy, 14th ed. § 60.50, at page 975.[8] While it relaxed the bona fide purchaser requirement for some purposes the 1950 amendment to the Act did not re-establish the relation-back concept.[9]

██ Appellants argue that assuming that they had only an equitable lien, the 1950 amendment to section 60, sub. a of the Act, 11 U.S.C. § 96, sub. a, incorporating paragraphs (6), (7) and (8) therein, expressly protects equitable liens from the taint of preferential transfer under the circumstances of this case.

The circumstances relied upon are that the mortgage instrument was executed for a new and contemporaneous consideration and was duly recorded within twenty-one days after execution of the instrument. Appellants contend that where such circumstances exist, the provisions of section 60, sub. a, (6), (7) and (8) protect equitable liens without the necessity of conversion into legal liens.

Paragraph (6) of section 60, sub. a starts out by declaring that the recognition of equitable liens where available means of perfecting legal liens have not been employed is "contrary to the policy of this section." Paragraph (6) then provides that if a transfer is for security and if "applicable law" requires some further overt act as a condition to its full validity against third persons other than buyers in the ordinary course of trade, and if such overt action has not been taken and the transfer therefore results in the acquisition of only an equitable lien, then such transfer is not perfected within the meaning of paragraph (2) of section 60, sub. a.

It will thus be seen that the whole tenor of paragraph (6) is restrictive with regard to what transfers may be regarded as perfected within the meaning of paragraph (2) of section 60, sub. a. Far from expanding the cognizability of equitable liens, a contrary policy is specifically stated. This policy is then fortified by express provisions requiring that where an overt act is called for by applicable law in order to perfect such a lien against third persons, failure to take

---

**8.** The rule announced in Thompson v. Fairbanks also required the trustee to show the existence of an actual lien creditor who could have prevented perfection of the mortgage by the taking of possession. Since the subsequent 1938 act set forth, as a test of the effectiveness of the transfer, the date upon which the transferee so perfected as to

prevail against a hypothetical bona fide purchaser, the rationale of Thompson v. Fairbanks in requiring the existence of an actual lien creditor or purchaser was effectively undermined. 3 Collier, Bankruptcy, 14th ed. § 60.38, at page 900.

**9.** 3 Collier, Bankruptcy, 14th ed. § 60.07, at pages 776–777.

such action negates the standing of the lien.[10]

■ Paragraph (6) cites several examples of overt acts which might, under "applicable law," convert an equitable lien into one having validity as against third persons. The examples so given are "a signed and delivered writing, or a delivery of possession, or a filing or recording, or other like overt action * * *." Appellants apparently construe this as a specification of overt acts any one of which will, for purposes of section 60, sub. a, be deemed sufficient to accomplish a perfected transfer.

The reference to "applicable law," however, is to the law of the state where the transaction occurs. Thus paragraph (6) does not purport to specify methods of perfecting an equitable lien which may be pursued without regard to state law. We have concluded that, under Oregon law, a delivery of possession to the mortgagee of after-acquired property covered by a chattel mortgage is necessary to the full validity of such a mortgage against unsecured creditors of the mortgagor.[11]

It follows that, under paragraph (6), such a mortgage is not, prior to the mortgagee obtaining possession, a perfected transfer within the meaning of paragraph (2) of section 60, sub. a.

Paragraph (7) of section 60, sub. a sets out rules to be applied in determining the time a transfer is deemed to be perfected within the meaning of paragraph (2), where such perfection depends upon the taking of overt action as required by applicable law. Under the applicable law of Oregon the taking of possession by the mortgagee of after-acquired property was essential to the perfection of a transfer based on a mortgage upon such property. Since appellant-mortgagees gained possession within four months of the filing of the bankruptcy petition, the transfer then consummated was preferential. Nothing in paragraph (7) calls for a contrary conclusion.

Paragraph (8) of section 60, sub. a provides for the case where, under applicable law, no overt act is necessary in order to perfect a transfer. In this event the same is deemed perfected at the time the initial transfer was made. This rule has no application in our case since, under Oregon law, an overt act (the taking of possession of after-acquired property by the mortgagee) was required.

In a supplemental memorandum filed subsequent to the filing of their reply brief, appellants advance a new argument involving paragraph (5) of section 60, sub. a. We have examined this argument and find it to be without merit.

Finally, appellants argue that the finding that appellants had reasonable cause to believe that DuVall's was insolvent at the time appellants took possession is

---

10. In paragraph (2) of section 60, sub. a transfers perfected against subsequent *lien creditors* are given recognition. But the implementing portion of paragraph (6) adds the further requirement in effect that if the lien is equitable only, then, in order for it to be recognized as a perfected transfer some overt action necessary under applicable law to its perfection against *all* third persons other than buyers in the ordinary course of trade, must have been taken. The paragraph (6) test has been stated more succinctly:

"* * * Does this equitable lien, which could have been but was not perfected as a legal lien, have full validity under local law as against all third persons, including *bona fide* purchasers, except a buyer in the ordinary course of trade?"

3 Collier, Bankruptcy, 14th ed. § 60.50 at page 980.

11. The requirement that in order to be recognized equitable liens must have been perfected against third persons rather than against subsequent lien creditors, was apparently included in paragraph (6) because in some jurisdictions equitable liens have priority over subsequent lien creditors but not over bona fide purchasers. Since we have already indicated that in Oregon subsequent lienholders have priority over equitable liens and since the priority of a bona fide purchaser would be at least as high as that of a subsequent lienholder we deem it unnecessary to determine the relative priority of a bona fide purchaser and the holder of an equitable lien.

**16**

clearly erroneous. Our examination of the record convinces us that this finding is not clearly erroneous.

The judgment is affirmed.