Carroll E. ENGELKES, Trustee in Bankruptcy for Harold Gibleon, Plaintiff,

v.

FARMERS CO-OPERATIVE COMPANY, Dike, Iowa, Defendant.

Civ. No. 923.

United States District Court
N. D. Iowa, E. D.
May 22, 1961.

defendant seeking to set aside and recover a payment in the amount of $11,-704.97 allegedly made by the bankrupt to the defendant within four months of bankruptcy. Plaintiff urges that such payment constituted a preferential transfer under the provisions of Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96. The defendant admits that the payment in question was made but denies that the circumstances under which it was made were such as to make the payment a voidable preference. The case was tried to the Court, which has jurisdiction under the provisions of Section 60, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. b.

The facts leading up to and surrounding the transaction in question are as follows. The bankrupt herein, Harold Gibleon, who will hereinafter be referred to as the bankrupt, was the owner and operator of a trucking line which had its headquarters in Conrad, Iowa. He operated that business from August, 1955, until August, 1958. In addition to general trucking for hire, he personally engaged in the buying and selling of grain for delivery to cattle feeders. The defendant is a co-operative grain elevator located in Dike, Iowa.

On or shortly before April 9, 1958, the bankrupt contacted the office of the defendant by telephone and talked to the assistant manager. He inquired about the price of the corn which the defendant had for sale and made arrangements to purchase approximately 800 bushels of corn. During the course of that conversation, the assistant manager of the defendant asked the bankrupt how he intended to pay for the corn and was told that payment would be made by a personal check drawn on the bankrupt's account at the Farmers Savings Bank of Grundy Center, Iowa. Although Conrad, Dike, and Grundy Center are all located in Grundy County, Iowa, the bankrupt at that time was unknown to those in charge of defendant's operations. Immediately after talking with the bankrupt on the telephone, the assistant manager of the defendant telephoned the

George J. Lindeman (of Beecher, Buckmaster, Beecher & Lindeman), Waterloo, Iowa, for plaintiff.

Wirt P. Hoxie and Max R. Teske, Jr. (of Pike, Hoxie, Butler & Teske), Waterloo, Iowa, for defendant.

GRAVEN, District Judge.

The plaintiff, as duly appointed trustee in bankruptcy for Harold Gibleon, bankrupt, commenced this action against the

Farmers Savings Bank of Grundy Center and talked to the cashier of that bank about the status of the bankrupt's account. He was told in substance that the bankrupt had maintained a checking account at that bank for some time, that he had always maintained a good balance, and that there was no apparent reason why his checks would not be honored. The cashier also told the assistant manager of the defendant that the bankrupt was "reported to be a thin operator," but that the bank could find no fault with his previous financial dealings with it.

Later on the same day, the bankrupt's trucks came to defendant's place of business and picked up 849 bushels of corn. The driver of the first truck delivered to the office of the defendant a blank check drawn on the Farmers Savings Bank of Grundy Center and signed by the bankrupt. After the last load of corn had been hauled out, the weights were totaled and the check was filled in by the employees of the defendant so as to cover the amount of the purchase price for the corn sold. The check was honored by the drawee bank in due course.

During the months of April, May, and June of 1958, the bankrupt continued to purchase corn from the defendant. The nature of each transaction was the same as the initial purchase. The bankrupt would place each order by telephone and then send along a blank check, drawn on the Farmers Savings Bank and signed by himself, with the driver of the first truck sent to pick up the corn. These checks were all subsequently filled in by employees of the defendant to cover the purchase price of the corn sold. Between April 9, 1958, and June 18, 1958, the bankrupt delivered thirteen checks to the defendant in this manner. These checks, totaling $46,122.40, were all honored by the Farmers Savings Bank in due course.

On or shortly before June 19, 1958, the bankrupt again ordered a substantial quantity of corn from the defendant by telephone. The corn so purchased was hauled away from defendant's place of business by the trucks of the bankrupt on June 19, 20, and 21. According to the established practice, a single blank check signed by the bankrupt was given to cover the price of the corn. That check was filled in by the employees of the defendant for the proper amount after all of the corn had been hauled out. The check was drawn on the Farmers Savings Bank and totaled $11,652.85. It was deposited by the defendant in the Iowa Savings Bank of Dike, Iowa, on June 23, 1958, which was a Monday. During that same week, the bankrupt telephoned the office of the defendant and informed the assistant manager that the last check he had given them would be returned because of insufficient funds. He suggested that if they would run the check through again he would make sure that there were enough funds on deposit to cover it. Shortly thereafter, the check for $11,652.85 was in fact returned because of insufficient funds. Upon receiving it, the assistant manager of the defendant immediately telephoned the Farmers Savings Bank. He was told by the cashier of that bank that the bankrupt seemed to be having a little difficulty with his checking account and that, in addition to defendant's check, two other checks drawn on his account had been returned because of insufficient funds. Subsequent to this conversation, the check in question was redeposited by the defendant but was again returned unpaid because of insufficient funds.

On at least four occasions between the time his check was initially returned to the defendant, and July 21, 1958, the bankrupt was contacted by the manager of the defendant. On each occasion the manager was informed by the bankrupt that the latter had sold a large amount of corn in the western part of the state for which he had not as yet been paid. The bankrupt gave the assurance that as soon as those accounts were collected he would be able to make good the $11,-652.85 check. When pressed for the names of some of these accounts, the bankrupt informed the manager of the defendant that one of the persons owing

him money was a man named McPherson who lived near Atlantic. Following the bankrupt's reference to a Mr. McPherson, the manager and assistant manager of the defendant checked with the sheriff's office and with several banks in Atlantic concerning the existence of a person named McPherson who might have been purchasing corn. They were unable to get any confirmation of the man's existence from those sources.

A few days prior to July 21, 1958, the manager of the defendant informed the bankrupt that the defendant had gone as far as it could with him and that it was about to turn the matter over to its attorney for handling. The bankrupt was informed that a meeting pertaining to the matter would be held at an attorney's office in Grundy Center on July 21, 1958, and that he might attend if he wished. Such a meeting was held and the bankrupt was present together with the manager and several directors of the defendant and the attorney retained by the defendant. At that time, the bankrupt was informed that his total obligation to the defendant, including attorney fees and protest fees, was $11,704.97. He then offered to settle that obligation by endorsing to the defendant certain checks payable to him which were drawn on a Marshalltown, Iowa, bank. These checks had been received from a customer as an advance for corn to be delivered in the future. The manager of the defendant refused to take the checks but offered to drive the bankrupt to Marshalltown so that the latter might cash the checks at the drawee bank. A trip was made to Marshalltown, the checks were cashed, and the bankrupt returned to the attorney's office in Grundy Center with cashier's checks totaling $11,200 and $504.97 in cash. The cashier's checks and cash were accepted by the manager of the defendant in full settlement of the debt owed it by the bankrupt and the latter was given a receipt therefor. On November 20, 1958, an involuntary petition in bankruptcy was filed against the bankrupt in this District by certain of his creditors under which he was subsequently adjudicated to be a bankrupt.

It is the payment made by the bankrupt to the defendant in the attorney's office on July 21, 1958, which is herein assailed as a preference. The date of that transfer falls within the four-month period prescribed by Section 60, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. a, by one day. All payments made by a debtor to his creditors, even though made during the four-month period preceding the filing of a petition in bankruptcy, are presumed to be valid and a trustee who seeks to avoid such payments bears the burden of establishing all of the several elements of a voidable preference as set forth in the Bankruptcy Act. Republic National Bank of Dallas v. Vial, 5 Cir., 1956, 232 F.2d 785, 789; Canright v. General Finance Corp., 7 Cir., 1941, 123 F.2d 98, 99; Doyle Dry Goods Co. v. Lewis, 8 Cir., 1925, 5 F.2d 918, 919; 3 Collier, Bankruptcy, par. 60.62 (1956). In order for a transfer to constitute a preference, as defined by Section 60, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. a, it must be: (1) a transfer of any of the debtor's property that is (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) made or suffered by the debtor while insolvent and (5) within four months of bankruptcy, (6) the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class. Dinkelspiel v. Garrett, D.C.1951, 96 F.Supp. 800, 803; 3 Collier, supra, par. 60.02. In addition, before a trustee may avoid a preference as above defined he must also establish that the creditor receiving the preference had, at the time when the transfer was made, reasonable cause to believe that the debtor was insolvent. Bankruptcy Act Sec. 60, sub. b, 11 U.S.C.A. § 96, sub. b; Dinkelspiel v. Garrett, supra.

In the present case, certain of the elements of a preferential transfer are quite clearly established and need not be

treated in detail. The first element, a transfer of the debtor's property, clearly appears from the facts heretofore set forth. The fifth element, relating to the four-month period, is clearly established by the record for, as it will later be demonstrated, the date of the transfer here involved must be taken as being July 21, 1958. The sixth element is also clearly established. Certain schedules listing the bankrupt's assets and his unsecured creditors at the time of bankruptcy have been introduced into evidence in this case. The bankrupt testified that they accurately reflect his financial situation in regard to such creditors. This evidence, which stands uncontroverted, clearly establishes that the unsecured creditors cannot possibly be paid in full. It naturally follows, therefore, that the bankrupt, by paying in full the debt he owed the defendant, enabled the latter to obtain a larger percentage of its debt than the other unsecured creditors. It is to be noted that it is far easier for the trustee to prove this element where the payment of a debt in full is attacked as preferential than where the partial payment of a debt is so attacked. As an example of the latter situation, see Barry v. Crancer, 8 Cir., 1951, 192 F.2d 939.

The principal controversies in the present case arise in connection with the second, third, and fourth elements of a preference, heretofore set forth, and the existence of a "reasonable cause to believe" that the debtor was insolvent at the time the transfer was made. The parties, in presenting the case, have treated the elements of "to or for the benefit of a creditor," and "on account of an antecedent debt," as identical for purposes of the proof required. They have assumed that if the transfer herein attacked was for an antecedent debt, it would necessarily mean that the defendant at that time was a creditor of the bankrupt. The Court is in accord with this view and those two elements will be considered together.

 It is well settled that in order for a preference to be effected, the transfer involved must diminish the fund to which other creditors of the same class may resort for payment. Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co., 1913, 229 U.S. 435, 443, 33 S.Ct. 829, 57 L.Ed. 1268; Brown Shoe Co. v. Carns, 8 Cir., 1933, 65 F.2d 294, 296; Dinkelspiel v. Weaver, D.C.1953, 116 F.Supp. 455, 459–460; 3 Collier, supra, par. 60.20. When a debtor engages in a straight cash transaction, wherein something of value is purchased for a reasonable price, a diminution of the debtor's estate does not occur. See cases cited in In re Nizolek Furniture & Carpet Co., Inc., D.C.1947, 71 F.Supp. 1012, 1015. Therefore, in order to be a preference, a transfer must be for an antecedent debt and not founded wholly on a new consideration. In applying the foregoing principles, it has been held that any extension of credit, no matter how brief, establishes an antecedent debt under Section 60 of the Act. National City Bank of New York v. Hotchkiss, 1913, 231 U.S. 50, 58, 34 S.Ct. 20, 58 L.Ed. 115; Engstrom v. Wiley, 9 Cir., 1951, 191 F.2d 684, 687; In re John Morrow & Co., D.C.1901, 134 F. 686. But, ordinarily, the holder of a check given as payment in a cash sale does not become a creditor on an antecedent debt by waiting a reasonable time to cash the check. Engstrom v. Wiley, supra, 191 F.2d at page 689; In re Perpall, 2 Cir., 1921, 271 F. 466, 468–469. If the check is honored in due course, there has been a substantially simultaneous exchange of cash for goods.

In the present case, the transaction on June 19–21 began as a cash transaction with no extension of credit. The issue presented is whether the delay in the ultimate payment transformed that transaction into one involving an extension of credit. In 4 Remington, Bankruptcy, Sec. 1661.2 (rev. ed. 1957), the author states:

"Delay in making a promised payment, transfer of property, or giving of security, in connection with a transaction which was intended by the parties to be current and upon present consideration, may result in

ultimate performance being regarded as with respect to past credit and on account of antecedent indebtedness. * * * "

Later, in the same Section, the author continues:

"Although a transaction starts out as a new one, for cash, it can become transmuted into one for credit where payment is delayed and the party to whom it is due treats the bankrupt as a general debtor without attempting to rescind."

The principles involved seem to be well illustrated by the case of Security Trust & Savings Bank v. William R. Staats Co., 9 Cir., 1916, 233 F. 514, certiorari denied 1916, 242 U.S. 639, 37 S.Ct. 111, 61 L.Ed. 540. In that case, the defendant sold 200 shares of oil stock to the bankrupt on March 15 and received a check for $12,900 as payment. On March 16, that check was returned to the defendant by the drawee bank because of insufficient funds. The bankrupt was informed of this fact on that same day and asked the defendant to put the check through the bank again. This was done and on March 18, the check was again returned unpaid. At the bankrupt's request, the defendant ran the check through the bank a third time, also on March 18, and again it was returned unpaid. Following this, the bankrupt informed the defendant that the bankrupt was soon to receive payment for some real estate sold by it and that it would be able to make good on the returned check as soon as this was concluded. On March 20, when again pressed about the matter by the defendant, the bankrupt conveyed to the defendant a security interest (trust deed) in certain real estate owned by it. The transfer of the security interest so given was later attacked as preferential. The Court of Appeals for the Ninth Circuit, in holding that the transaction did effect a preference, rejected the contention of the defendant that the relationship between the parties to the transfer was not that of debtor and creditor. The Court stated in this respect (233 F. at page 518):

"* * * we believe that the Staats Company [the defendant] became a general creditor of the bankrupt, and that the transaction was broken in its continuity when the Staats Company agreed to wait for its money and to send the check through the bank the second and third time, and when it agreed to wait to see whether the bankrupt would obtain money which its agents said was expected from the sale of certain other property, no effort having been made by the Staats Company to prevent the shares of stock which had been sold and delivered to the Stilson Company [the bankrupt] from passing out of the hands of the Stilson Company. * * * "

The rationale of the Staats case has been tacitly approved by the Court of Appeals for this circuit in the case of Bostian v. Levich, 8 Cir., 1943, 134 F.2d 284, 286.

It is the view of the Court that the circumstances in the present case were such that the defendant did become a creditor of the bankrupt after the check was initially returned because of insufficient funds and that the payment made by the bankrupt on July 21, was made upon this antecedent obligation. The manager of the defendant testified that he was not concerned when the check was originally returned unpaid and that he considered that it would only be a matter of time before the defendant made good upon the obligation. This is evidence of an extension of credit in fact even though not made willingly. This finding is in accord with the well-settled rule that property converted, embezzled, obtained by fraud, or otherwise misappropriated by a bankrupt can be claimed from the bankrupt estate only so long as it can be definitely traced, with the consequence that repayment by the bankrupt with other than the very property taken or the traceable proceeds thereof will constitute a preference if the other elements of Section 60 are present. See Cunningham v. Brown, 1924, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (Ponzi case); Morris Plan Industrial Bank of

New York v. Schorn, 2 Cir., 1943, 135 F. 2d 538, 539; Atherton v. Green, 7 Cir., 1910, 179 F. 806, 808, 30 L.R.A.,N.S., 1053; Malone v. Gimpel, D.C.1956, 151 F.Supp. 549, 554; Dinkelspiel v. Garrett, D.C.1951, 96 F.Supp. 800, 804–805. See generally in this respect the cases collected in 103 A.L.R. 310 (1936). In attempting to trace the property misappropriated, the rules of equity relating to the tracing of trust property are to be applied. Atherton v. Green, supra, 179 F. at page 808; 3 Collier, supra, par. 60.18.

The conversion and fraud cases illustrate that a willing extension of credit is not necessary in order to create an antecedent debt under the preference provisions of the Act. In Atherton v. Green, supra, the Court stated (179 F. at page 808):

"* * * the misappropriation [by the bankrupt] vested no right to the fund in favor of the estate in bankruptcy, and the owner in such case is entitled to follow and recover the amount, in so far as it either remains on hand or is traceable into other investments or property derived therefrom. Failing such recourse to the trust fund, it is optional with the owner to treat the misappropriation as an indebtedness, thereby becoming a creditor on a par with other general creditors of the estate and subject to the bankruptcy provisions applicable to such relation. *With neither the property nor its proceeds appearing on hand in any form, the fact that the indebtedness arose through conversion of the property gives the owner thereof no right of preference over general creditors.*" (Emphasis supplied.)

It is the view of the Court that the present situation is similar to the conversion and fraud cases. The corn in question was parted with by the defendant upon the implied condition that the check given as payment would be honored by the bank. See Crescent Chevrolet Co. v. Lewis, 1941, 230 Iowa 1074, 300 N.W. 260, 262. When the check was returned unpaid, the defendant had a right to repossess the corn if it could be traced. If the corn which had been delivered in exchange for the check or the proceeds derived directly therefrom could not be traced, the defendant stood as a general creditor of the bankrupt to the extent of the unpaid check. The record in the present case does not reveal the disposition made by the bankrupt of the corn in question. The record does reveal that the July 21, payment was not made with the proceeds from the sale of that corn. Whether or not the defendant could at any time have successfully recovered back the corn is immaterial, however. The impossibility of rescission does not prevent one from being forced into the status of a general creditor. Atherton v. Green, supra, 179 F. at page 808.

The defendant maintains that the payment made on July 21, 1958, did not in fact result in a diminution of the bankrupt's estate because, under the Iowa sales law, title to the corn did not pass to the bankrupt in the worthless check transaction. It is therefore urged that on July 21, there was a fair exchange founded on present consideration; the bankrupt's estate receiving title to the corn and the defendant receiving the equivalent in cash. While the defendant is correct as to the passage of title under the Iowa law, it would require a strained construction of the July 21 transaction in order to consider the payment made as being for the release of the defendant's right to recover back the corn taken on June 19–21 rather than being a delayed payment for the corn itself. Perhaps, in a proper factual situation, a delayed payment could be considered to be given for the release of an existing right of rescission but in the present case all the evidence is indicative of a creditor diligently pursuing its debtor for payment on an existing obligation. It is doubtful that there was ever any possibility of recovering back the corn. This view is in accord with the holding of the Court in Security Trust & Savings Bank v. William R. Staats Co., supra, wherein an identical argument was advanced. In rejecting

the argument, the Court of Appeals for the Ninth Circuit stated (233 F. at page 518):

"That part of the argument made by the appellee * * * wherein the point is made that the giving of the check by the [bankrupt] was a representation that that corporation had sufficient funds to meet the check, and that, such a representation not being true, a fraud was perpetrated * * * and that title remained in the Staats Company [appellee], and did not pass until the note and deed of trust were accepted, has received our careful consideration. But whatever right of rescission existed because of misrepresentation by the [bankrupt] in giving the check was abandoned by the position taken when security was accepted for the purchase money."

The case of Engstrom v. Benzel, 9 Cir., 1951, 191 F.2d 689, relied upon by the defendant, reaches a different conclusion than that just advanced. It is to be noted, however, that the Benzel case was decided under the provisions of the preference laws of the State of Washington rather than under Section 60 of the Bankruptcy Act. For an excellent treatment of this area of the law wherein the Benzel case is criticized as authority under the Bankruptcy Act, see Fallon, Cash Sales—Bad Check Doctrine—Waiver—Voidable Preferences, 26 Referees' Journal 117 (1952).

 Remaining to be considered is the question of the bankrupt's insolvency on July 21, 1958, and the additional question of whether, on the basis of the facts available to it, the defendant had reasonable cause to believe that the bankrupt was insolvent on that date. Section 1(19) of the Bankruptcy Act, 11 U.S.C.A. § 1(19), provides:

"A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or per-mitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts."

It is to be noted that the definition of "insolvency" appearing in the Bankruptcy Act is a "balance sheet" definition and requires the weighing of assets against liabilities. It differs in this respect from the conventional definition of insolvency which is "a general inability to meet pecuniary liabilities as they mature, by means of either available assets or an honest use of credit." See 4 Remington, supra, Sec. 1686 (footnote 6). Ordinarily, an adjudication that an individual is bankrupt creates no presumption of the bankrupt's insolvency at some prior date. Arkansas Oil & Mining Co. v. Murray Tool & Supply Co., 8 Cir., 1942, 127 F.2d 564, 566; Dinkelspiel v. Weaver, D.C.1953, 116 F.Supp. 455, 461. However, if it is shown that a debtor is insolvent at the time of being adjudicated a bankrupt, and further shown that no substantial change in his financial condition has occurred between the time of an alleged preference and the time of adjudication, such evidence may be sufficient to establish insolvency at the time of the alleged preference. Brown Shoe Co. v. Carns, 8 Cir., 1933, 65 F.2d 294, 296; Dinkelspiel v. Weaver, supra, 116 F.Supp. at page 461.

 In the present case, schedules were filed by the bankrupt on January 8, 1959, in connection with the administration of his estate in bankruptcy. The information contained in those schedules clearly shows that on that date his debts greatly exceeded his assets. Those schedules were introduced into evidence and the bankrupt testified that they accurately reflected his financial condition at the time of bankruptcy. In addition, the bankrupt testified that there had been no substantial change in his condition between bankruptcy and July 21, 1958, the date of the challenged transfer. Nothing in the record contradicts this evidence and it is the finding of the Court, based on such evidence, that the

bankrupt was in fact insolvent in the bankruptcy sense on July 21, 1958. Insolvency was similarly established in the case of New York Credit Men's Association v. Chaityn, D.C.1939, 29 F.Supp. 652, 653.

The plaintiff has established by a preponderance of the evidence all of the elements of a technical preference. However, in order to avoid the transfer here involved as a preference, the plaintiff has to further establish by a preponderance of the evidence that at the time of said transfer the defendant had "reasonable cause to believe" that the bankrupt was insolvent.

In considering the cases relating to this question, some difficulty is encountered from the fact that the applicable provisions of the Bankruptcy Act have been altered from time to time. Under the Act of 1898 (30 Stat. 562), it was necessary to establish that the creditor had reasonable cause to believe that the transfer was intended as a preference before such transfer could be avoided. Under the 1910 amendment (36 Stat. 842), the provision was changed so as to make a preference voidable if there had been reasonable cause for the creditor to believe that a preference would be effected. The present provision was inserted in the Chandler Act of 1938 (52 Stat. 869) and requires only that the trustee establish that the creditor had a reasonable cause to believe that the debtor was insolvent at the time of the transfer. Because of the changes in the Act, cases decided under provisions other than the present statute are not always helpful.

The question as to whether the defendant had "reasonable cause to believe" that the bankrupt was insolvent at the time of the transfer in question is one of fact. The cases involving that question generally involve a variety of circumstances peculiar to the particular case. See Harrison v. Merchants National Bank, 8 Cir., 1942, 124 F.2d 871, 873. However, some rules appear from the cases. It is not essential that the creditor have actual knowledge of, or believe in, his debtor's insolvency. If he has knowledge of facts sufficient to put a prudent man on inquiry, he is chargeable with knowledge of the facts which such inquiry would disclose. Marks v. Goodyear Rubber Sundries, Inc., 2 Cir., 1956, 238 F.2d 533, 535, 62 A.L.R.2d 770; Dinkelspiel v. Weaver, D.C.1953, 116 F. Supp. 455, 462; Rollins v. Repper, D.C. 1947, 69 F.Supp. 976, 979; 3 Collier, supra, par. 60.53. The Courts have been careful to distinguish a "reasonable cause to believe" in a debtor's insolvency from mere apprehension or suspicion on the part of the creditor. Reasonable cause to suspect is not the equivalent of a reasonable cause to believe. Harrison v. Merchants National Bank, 8 Cir., 1942, 124 F.2d 871, 873; 3 Collier, supra, par. 60.53.

The plaintiff contends that he has established by a preponderance of the evidence that the defendant, at the time of the transfer, had reasonable cause to believe that the bankrupt was insolvent. In support of that contention, he calls attention to the following items of evidence: (1) the defendant had been informed by the Farmers Savings Bank at the inception of its dealings with the bankrupt that he was "reported to be a thin operator"; (2) a check given to the defendant by the bankrupt was twice returned by the bank on which it was drawn for insufficient funds; (3) the defendant was informed by the same bank that at least two other checks drawn on the bankrupt's account had been dishonored prior to the dishonor of the defendant's check; (4) the defendant pressed the bankrupt hard for payment and eventually gave him the ultimatum about turning the matter over to an attorney for handling; (5) the defendant knew that the bankrupt had given it erroneous information about a particular person who was alleged to be indebted to the bankrupt.

The defendant contends that the circumstances relied upon by the plaintiff do not, in view of all of the other surrounding circumstances, establish that

the plaintiff had reasonable cause to believe that the bankrupt was insolvent at the time of the transfer. In connection with that contention, the defendant cites the case of Harrison v. Merchants National Bank, 8 Cir., 1942, 124 F.2d 871. The Court in that case stated as follows (124 F.2d at page 873):

"As one views any business failure in the retrospect, many incidents and circumstances bearing upon a bankrupt's financial condition loom much larger and more formidable than they did before the crash occurred. All well-considered cases have enunciated the doctrine that mere apprehension on the part of the creditor is not equivalent to good cause to believe that insolvency exists. * * *"

Under the Bankruptcy Act, the definition of insolvency is not based upon an inability to meet debts as they become due but rather upon an insufficiency of assets to pay debts. Therefore, a shortage of ready money does not in and of itself evidence insolvency. For this reason, the fact that a creditor knows of the inability of a debtor to make payments on demand is not conclusive on the question of reasonable cause. De Santo v. Noto Lumber Co., D.C.1957, 153 F.Supp. 801, 803; In re Venie, D.C. 1948, 80 F.Supp. 247, 249. Knowledge that a debtor is short of cash is not necessarily grounds for believing him to be insolvent. Salter v. Guaranty Trust Company, D.C.1956, 140 F.Supp. 111, 114. The fact that a creditor knew that some of the debtor's checks had been dishonored is not conclusive on the question as to whether the creditor had reasonable cause for believing the debtor to be insolvent. Bostian v. Levich, 8 Cir., 1943, 134 F.2d 284, 286.

It is the claim of the defendant that the inferences to be drawn from all of the circumstances are consistent with the theory that the defendant did not have reasonable cause to believe that the bankrupt was insolvent and that the inferences to be drawn from the circumstances relied on by the plaintiff are not entitled to the weight claimed for them by the plaintiff. In 3 Collier, supra, par. 60.62, it is stated:

" * * * The law places upon the trustee (or receiver) the unmistakable burden of proving by a fair preponderance of all the evidence every essential, controverted element resulting in the composite voidable preference. A presumption arises that payments made by the bankrupt to creditors are valid, and the trustee seeking to recover such payments must overcome this presumption by adequate proof of a voidable preference. Where inferences from proved facts are to be drawn, the rule obtains that if two inferences of substantially equal weight may reasonably be drawn from the proved facts, then that inference shall prevail which sustains the transfer. * * *"

The fact that the defendant had been informed some months earlier that the bankrupt was reported to be a "thin operator" did not in itself give rise to the inference he was insolvent. The defendant sold grain to the bankrupt for a period of more than two months thereafter, during which time the bankrupt purchased grain and gave thirteen checks for grain totaling over $46,000 which were promptly paid. The dishonor of the check in question and two other checks could be as consistent with the theory that the bankrupt was temporarily short of ready money as it was with the theory that he was insolvent. The fact that he was able to raise a substantial amount of money to meet the check in question would tend to support the former theory. The fact that the defendant misrepresented the existence of a particular account receivable could be consistent with the theory that the bankrupt was stalling for time to raise the money that he did raise. The fact that the defendant pressed the collection of the check in question with vigor is not necessarily inconsistent with the theory that the defendant did not have reason-

able ground to believe that the bankrupt was insolvent. Where a vendor has sold a substantial amount of merchandise upon a presumed cash basis and the check given by the purchaser for such merchandise is dishonored, that vendor would naturally press for payment of the check regardless of the financial condition of the purchaser.

Up until the time the check in question was dishonored, the business relationship between the defendant and the bankrupt had been very satisfactory. Viewing the circumstances as they existed at the time of the alleged preference, there was only one blot on an otherwise satisfactory record. The defendant knew that the nature of the bankrupt's business operations was such that he bought corn for resale, a practice which might well result at times in a shortage of ready cash for business purposes.

The inferences to be drawn from the proved facts are as consistent with the theory that the defendant did not have reasonable cause to believe that the bankrupt was insolvent as they are with the theory that the defendant did have reasonable cause to believe that the bankrupt was insolvent at that time. Such being the situation, the plaintiff having the burden of proving the affirmative must fail. In the absence of the establishing of the affirmative by a preponderance of the evidence, the negative prevails.

It is the finding and holding of the Court that the plaintiff has failed to establish by a preponderance of the evidence that the defendant had reasonable cause to believe that the bankrupt was insolvent at the time of the transfer in question. See, in this connection, Lang v. First National Bank, 5 Cir., 1954, 215 F.2d 118, 120–122; Salter v. Guaranty Trust Company of Waltham, D.C.1956, 140 F.Supp. 111, 114; Dinkelspiel v. Weaver, D.C.1953, 116 F.Supp. 455, 462.

Because of the failure of the plaintiff to establish by a preponderance of the evidence that the defendant at the time of the transfer did have reasonable cause to believe that the bankrupt was insolvent, the transfer may not be avoided.

It Is Ordered that judgment shall be rendered in favor of the defendant.

The foregoing Opinion shall constitute the Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.