**In the Matter of ADVANCE GLOVE MANUFACTURING CO., Debtor.**

**G.E. GROGAN, Trustee for Advance Glove Manufacturing Co., Plaintiff,**

**v.**

**CHESEBROUGH–PONDS, INC., Defendant.**

**Bankruptcy No. 81–01572–B. Adv. No. 82–0649.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Dec. 9, 1982.

522

Jaffe, Snider, Raitt & Heuer, P.C. by Jonathan S. Green, Detroit, Mich., for G.E. Grogan, trustee/plaintiff.

Irving Schneider, New York City by Irving I. Boigon, Southfield, Mich., for Chesebrough-Ponds, Inc., defendant.

## OPINION

GEORGE BRODY, Bankruptcy Judge.

The question presented is whether the delivery of a check is equivalent to payment for the purpose of section 547(c)(2).

The facts have been stipulated and are as follows:

1. Chesebrough-Ponds, Inc. (defendant) sold to the Joseph Frenkel Division of Advance Glove Manufacturing Company (debtor) certain merchandise by invoice dated December 11, 1980.

2. The merchandise was delivered to the debtor on or about December 11, 1980.

3. The terms of sale provided that the debtor was to receive a 1% discount if the invoice was paid within 30 days.

On or about January 20, 1981, the debtor issued and delivered a check in the amount of $2,483.04 to the defendant in payment of the invoice.

4. The check was not honored and paid by the drawee bank until February 24, 1981.

5. On March 19, 1981, the debtor filed a petition under Chapter 11 of the Bankruptcy Code. Thereafter, the Chapter 11 proceeding was converted to Chapter 7 and a trustee was appointed. The trustee filed a complaint to recover the $2,483.04, contending that the payment was preferential and, since the facts were not in dispute, moved for summary judgment.

Section 547(b) of the Bankruptcy Code provides that, except as provided in subsection (c), the trustee may avoid any "transfer of property of the debtor—"

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The defendant concedes that the factual elements of section 547(b) are present but relies upon paragraphs (1) and (2) of subsection (c), as a defense to the trustee's action. Section 547 provides in pertinent part that a trustee may not avoid a transfer which is preferential under section 547(b)

(1) to the extent that such a transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms; . . .

§ 547(c)(1), (2).

Initially, the defendant contends that the sale and payment were intended to be, and in fact were, a contemporaneous exchange and, therefore, the transfer is protected by section 547(c)(1). This contention is without merit. The facts clearly reveal that the sale was a credit transaction.

Additionally, the defendant contends that the payment was made within 45 days after the debt was incurred and, therefore, the payment is protected by section 547(c)(2). To decide the issue raised by this defense, it is necessary to determine when the debt was incurred and when payment was made.

A debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt. 4 *Collier on Bankr.* § 547.39 (15th ed. 1982).[1] A buyer obtains a property interest in goods

[b]y identification of existing goods to which the contract refers.... In the absence of explicit agreement, identification occurs

(a) when the contract is made if it is for the sale of goods already existing and identified;

(b) if the contract is for the sale of future goods other than those described in paragraph (c), when the goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers.

M.C.L.A. § 440.2501. The debtor obtained a property interest in the goods on December 11, 1980, when the goods were shipped.[2] The debt was incurred on December 11, 1980. *Hertzberg v. Hirschfield, (In re Caro Products),* 23 B.R. 245 (Bkrtcy.E.D.Mich. 1982); *Iowa Premium Service Co. v. First National Bank (In re Iowa Premium Service Co., Inc.),* 676 F.2d 1220, 9 Bankr.Ct. Dec. (CCH) 111 (8th Cir.1982); *Trauner v. Stephenson (In re Valles Mechanical Industries, Inc.),* 20 B.R. 350, 9 Bankr.Ct.Dec. (CCH) 334 (Bkrtcy.N.D.Ga.1982). *See also,* 4 *Collier on Bankr.* § 547.38 (15th ed. 1979). Levin, *An Introduction to the Trustee's Avoiding Powers,* 53 *Am.Bankr.L.J.* 173 (1797).

Since the debt was incurred on December 11, 1980, it is necessary to determine when payment was made. The check in payment of the debt was delivered on January 20, 1982, clearly within 45 days from the date that the debt was incurred. However, the check was not paid by the drawee bank until February 24, 1981, 75 days after the debt was incurred. Thus, the validity of defendant's defense depends upon whether

delivery of a check or cashing a check by the drawee bank constitutes payment within the meaning of section 547(c)(2).

The Code defines transfer to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property...." § 101(40). The delivery of the check constituted a transfer of property. Additionally, the Code provides that

a transfer of ... property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

§ 547(e)(1)(B). While the Bankruptcy Code defines the term "transfer," the Bankruptcy Code does not deal with the operative events that determine when a transfer has taken place. To make this determination, it is necessary to look to state law. *McKenzie v. Irving Trust Co.,* 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945); *see also, Dudley v. Eberly,* 201 F.Supp. 728 (D.Or.) *aff'd.* 314 F.2d 8 (9th Cir.1962); Countryman, *The Use of State Law In Bankruptcy Cases,* 47 N.Y. U.L.Rev. 631 (1972); 3 *Collier on Bankr.* ¶ 60.39 at 957 (14th ed. 1977). The Uniform Commercial Code which has been adopted in Michigan, provides that a check "does not of itself operate as an assignment of any funds in the hands of the drawee available for its repayment, and a drawee is not liable on the instrument until he accepts it." M.C.L.A. § 440.3409. A check is merely

an order to the drawee bank to pay the sum stated and does not constitute a delivery of the fund until it is paid. The date of payment and not the date of delivery is crucial in determining when the preferential transfer occurred.

*In re Duffy,* 3 B.R. 263, 265 (Bkrtcy.S.D.N. Y.1980). Until a check is honored by the drawee bank, a third party can acquire a right in the funds superior to that of the

---

1. Tax debts, however, because of explicit Code direction, are incurred when a tax is "last payable including any extension, without penalty."

2. "In the usual sales situation, it may make sense to recognize that the debt is incurred

when the debtor obtains a property interest in the goods purchased unless a different time for payment is agreed upon by the parties." B. Weintraub & A. Resnick, *Bankruptcy Law Manual* ¶ 7.05[4] at 7–17 n. 72 (1980).

payee. Additionally, prior to the release of the funds by the bank, the transferor can stop payment on a check. It follows, therefore, that a transfer of property by check is not perfected until the check is honored by the drawee bank. *See Gropper v. Samuel Kunstler Textiles, Inc. (In re Fabric Buys of Jericho, Inc.),* 22 B.R. 1013 (Bkrtcy.S.D.N.Y. 1982); *Carmack v. Zell (In re Mindys, Inc.),* 17 B.R. 177 (Bkrtcy.S.D.Ohio 1982); *Larimore v. Weyand & Son, Inc. (In re Kimball),* 16 B.R. 201 (Bkrtcy.M.D.Fla.1981); *Itule v. Luhr Jensen & Sons, Inc. (In re Sportsco, Inc.),* 12 B.R. 34 (Bkrtcy.D.Ariz. 1981); *In re Duffy.*

The defendant, however, contends that the conclusion reached, that the date of payment is the date when the check is cashed, ignores the legislative history which expressly states that

> Contrary to language contained in the House Report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2).[3]

██ All the cases relied upon by the trustee which hold that the perfection of a transfer involving a check takes place when the check is honored reach this conclusion

without considering the legislative statement now relied upon by the defendant. *In re Garland,* 19 B.R. 920, 929 (Bkrtcy.E.D. Mo.1982), reaches a contrary result based solely upon this statement. The courts that have ignored the September 28th and October 6th statement apparently did so on the theory that resort to legislative materials is irrelevant when a statute is clear and unambiguous. This theory clearly has no substance in light of the Supreme Court's ruling in *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). In that case, the court held that

> when aid to construction to the meaning of words, as used in the statute is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." [4]

Thus, even though the statutory language is clear and unambiguous, the legislative history is not to be ignored, if it casts any light on the question before the court.

Any inquiry to resolve this question must begin with a discussion of section 547(c)(1) and the House comment with respect to it, since that comment triggered the statement now in controversy.

---

**3.** This statement was made by both the Honorable Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, and by the Honorable Dennis DeConcini, Chairman of the Subcommittee on Improvements of Judicial Machinery of the Senate Committee on the Judiciary. The statement by Congressman Edwards was made on September 28, 1978, when he introduced the House Amendment to the Senate Amendment to H.R. 8200. 124 Cong. Rec. H 11,097 (daily ed. Sept. 28, 1978) (statement of Mr. Edwards). The statement by Senator DeConcini was made on October 6th, when he introduced the Senate Amendment to the House Amendment to H.R. 8200. 124 Cong.Rec. S 17,414 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).

**4.** *Train v. Colorado Pub. Interest Group, Inc.,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (quoting *United States v. American Trucking Assns.,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). The Supreme Court vacillated between the rule adopted in *Train* and the so-called "plain-meaning" rule. Simply stated,

this rule asserts that "where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." *United States v. Missouri Pacific Railroad Co.,* 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929). Generally, whether a court applies the plain-meaning rule or the rule enunciated in *Train* is merely academic. For "even under the plain meaning rule there are many ways in which a court could look at legislative history, if it wanted to—by characterizing the words as 'ambiguous,' by finding that their plain meaning led to 'absurd' results, or by using extrinsic aids to 'confirm' the plain meaning." Murphy, *Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts,* 75 Colum.L.Rev. 1299, 1301 (1975). In fact, in *Train* the court could very easily have found that the words to be construed were not as unambiguous as they were found to be by the court of appeals. *See id.* at 1308–17.

■ Section 547(c)(1) excepts from preference attack a transfer that the debtor and creditor intended to be a contemporaneous exchange for new value given to the debtor, and where the exchange was "in fact substantially contemporaneous."

Under the Bankruptcy Act, courts had held that when a cash sale was intended, the acceptance of a check instead of cash did not change the character of the transaction so long as the payee cashed the check within a reasonble time. *Engstrom v. Wiley,* 191 F.2d 684 (9th Cir.1951); *Engelkes v. Farmers Co-operative Co.,* 194 F.Supp. 319 (N.D.Iowa 1961). The House Report made

it clear that section 547(c)(1) was intended to codify cases such as *Engstrom* and *Engelkes* [5] by providing that whereas "normally a check is a credit transaction" for the purposes of section 547(c)(1), a check is the equivalent of "cash" if the check is presented for payment within 30 days.[6]

Section 547(c)(2), however, had no counterpart in prior law. Section 547(c)(2) was adopted to counterbalance the elimination of the "reasonable cause to believe" requirement of section 60(a).[7] The House Report with respect to section 547(c)(2) merely summarized the statutory language.[8] The staff that drafted the comment was aware

5. Section 547(c)(1) also was intended to codify cases such as *Dean v. Davis,* 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917) and *National City Bank v. Hotchkiss,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). *See* Countryman, *Bankruptcy Preferences—Current Law and Proposed Changes,* 11 U.C.C.L.J. 95 (1978). In *Dean v. Davis,* "the Supreme Court held that there was no preference where a loan was intended by both parties to be a secured loan even though the mortgage was not actually executed until seven days after the loan was made." *Id.* at 95. The Court held that the loan and mortgage, even though they were ten days apart, were substantially contemporaneous because the parties so intended. In *National City Bank v. Hotchkiss,* in contrast, the Supreme Court determined a transfer to be preferential where a bank made an unsecured day loan to a broker at 10:00 a.m. and demanded and received security for the loan on the same day after learning that the debtor was in financial difficulty.

6. The Comment in its entirety reads as follows: The first exception [§ 547(c)(1) ] is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous," and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3–503(2)(a), that will amount to a transfer that is "in fact substantially contemporaneous."
H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977) [hereinafter cited as H.R. 595], U.S.Code Cong. & Admin.News 1978, pp. 5787, 6329. An identical, comment appears in the Senate Report.

7. The preference provision of the Bankruptcy Act was adopted to promote equitable distribu-

tion to creditors and to remove creditors' incentive to profit from a race of diligence. H.R. 595, *supra* note 6, at 177–78. Under the Bankruptcy Act, the trustee to successfully attack a transfer as preferential had to establish that the debtor was insolvent and that the creditor had reasonable cause to believe that the debtor was insolvent. § 60(a). Requiring the trustee to establish these elements frustrated the purposes for which the preference provision was enacted. H.R. No. 595, at 178 (1977). The Code eliminated the "reasonable cause to believe" test. In addition, the Code creates a statutory presumption of insolvency during the preference period. § 547(f). In the absence of paragraph (c)(2) of section 547, any payment to satisfy an existing indebtedness, if made within 90 days of bankruptcy, would have been subject to attack.

8. The Comment in its entirety reads as follows: The second exception [547(c)(2) ] protects ordinary course of business (or financial affairs, where a business is not involved) transfers. For the case of a consumer, the paragraph uses the phrase "financial affairs" to include such nonbusiness activities as payment of monthly utility bills. If the debt on account of which the transfer was made was incurred in the ordinary course of both the debtor and the transferee, if the transfer was made not later than 45 days after the debt was incurred, if the transfer itself was made in the ordinary course of both the debtor and the transferee, and if the transfer was made according to ordinary business terms, then the transfer is protected. The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.
H.R. 595, *supra* note 6, at 373, U.S.Code Cong. & Admin.News 1978, p. 6329.

that "normally a check is a credit transaction". It recognized this principle in the prior paragraph dealing with section 547(c)(1). It is reasonable to assume that if Congress had intended to treat a check for the purposes of section 547(c)(2) other than as a credit transaction, it would have so stated.

■ Subsections 547(c)(1) and (c)(2) address different issues. Section 547(c)(1) deals with the character of a transfer when it was made. Section 547(c)(2), in contrast, delineates the conditions which have to be met to protect the transfer involving a credit transaction otherwise subject to preferential attack. There is a rational basis for treating a check as a "cash" transaction for section 547(c)(1) and not for section 547(c)(2).

In the absence of any evidence to the contrary, the conclusion is inescapable that Congress did not intend to equate delivery of a check with payment for purposes of the section 547(c)(2) exception. The "naked" reference to section 547(c)(2) in the statement relied upon by the defendant does not constitute such evidence. The only statement in the House Report dealing with the question whether a check constitutes payment when it is delivered or when it is cashed appears with reference to section 547(c)(1). The legislative statement relied upon by the defendant was intended to do nothing more than modify the time limit within which a transferee had to present a check for payment to retain his protected status under section 547(c)(1). There is nothing in the legislative history other than the unexplained, enigmatic reference to section 547(c)(2) in that comment to indicate that the phrase, "payment is considered to be made when the check is delivered," was intended to apply to section 547(c)(2). If the drafters had intended to make that phrase applicable to section 547(c)(2), it is reasonable to assume that this fundamental change in policy would have been included in the comment that dealt with section

547(c)(2). This they did not do. The reference to section 547(c)(2) in the statements made by Congressman Edwards and Senator DeConcini appears to be clearly inadvertent, gratuitous and unintentional.

The sequence of events that led to the release of these statements buttresses the conclusion that the reference was inadvertent. The House of Representatives passed H.R. 8200 in February of 1978. The Senate did not adopt its version of H.R. 8200 until September of 1978. The bills, as was to be expected, had many significant differences. It became apparent that these differences could not be resolved by formal legislative procedure prior to the adjournment of the 95th Congress. As a result, it was agreed that informal proceedings would be employed in an attempt to iron out the differences. The floor managers of the bill of both the House and the Senate met informally and reached an accommodation. The extensive changes that were made to resolve the Senate and House versions of H.R. 8200 appear in the September 28th and October 6th daily edition of the Congressional Record. These statements include the comment relied upon by the defendant. The Congressmen and Senators interested in obtaining passage of H.R. 8200 were working under terrific pressure and time constraints in a legislative process which, at best, has been described as "organized confusion." [9] It is readily evident how the inadvertent reference to section 547(c)(2) could have been included and could have survived detection. For an informative discourse tracking the progress of H.R. 8200 until enacted, *see* Klee, *Legislative History of the New Bankruptcy Code*, 54 *Am.Bankr. L.J.* 275 (1980).

■ In construing legislation, the function of the court is to ascertain what the legislature intended to accomplish by the legislation enacted. This intent may be garnered from any available legislative materials, if they clearly reveal this intent. The solitary, unexplained reference relied

---

**9.** The working climate in Congress was so characterized by former Senator and Associate Justice of the Supreme Court, James F. Byrnes, in chapter 9 of his autobiography, J. Byrnes, *All in One Lifetime* (1948).

upon by the defendant is addressed to a section with a purpose unrelated to section 547(c)(2) and does not clearly reveal any legislative intent with respect to the issue before the court. The reference was not included in a detailed, reflective committee report explaining the reason for its inclusion. It appears only in a statement made by the floor managers of the bill on the eve of the bill's passage. The reference, even if intended by the floor managers of the bill, does not necessarily represent the intent of the Legislature. Not all legislative materials are to be accorded the same weight in determining legislative intent.

A painstakingly detailed report by a senate committee bearing directly on the immediate question may settle the matter. A loose statement even by a chairman of a committee made impromptu in the heat of debate, less informing in cold type than when heard on the floor, will hardly be accorded the weight of an encyclical.

Frankfurter, *Reflections on Reading Statutes* in *an Autobiography of the Supreme Court,* 323 (Westin 1963). What Congress intended with respect to the present controversy is, at best, inconclusive. Section 547 speaks clearly and unambiguously to the issue now before the court. When the meaning of the statute is clear, inconclusive legislative statements are not to be used to reach a result completely at variance with the statute's purpose. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Or, as more eloquently stated in *United Transportation v. Consolidated Rail Corp.:*

When the evidence revealed by an excursion into materials simply forming a part of the basis on which Congress acted is "sufficiently ambiguous . . . to invite mutually destructive dialectic but not strong enough to either strengthen or weaken the force of what Congress has enacted," a court should disregard it.

535 F.Supp. 697, 705 (1982) *cert. denied,* —— U.S. ——, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982) (quoting *FCC v. Columbia Broadcasting System,* 311 U.S. 132, 136–37, 61 S.Ct. 152, 153–54, 85 L.Ed. 87 (1940)). Section 547 embodies a fundamental concept of bankruptcy legislation. It is not to be negated by a solitary, unexplained reference hidden in the Congressional Record—a reference made under circumstances which, for all practical purposes, deprived the Senate and the House of an opportunity to study and to reflect on its implications. If Congress had intended to make a basic change in the preference concept, it is not unreasonable to assume that such an intention would have been clearly and unambiguously expressed.[10]

There are additional, clearly unintended consequences that would follow if section 547 were re-written to reach the result urged by the defendant. If a check constituted payment when delivered, debtors and creditors would be in a position to enter into collusive and fraudulent agreements to frustrate "the prime bankruptcy policy of equality of distribution among creditors of the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 178 (1977), U.S.Code

10. The legislative comments to section 547(c)(1) in their entirety leave a lot to be desired. Section 547(c)(1), it is generally agreed, was intended to codify cases such as *Dean v. Davis,* 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917), and *National City Bank v. Hotchkiss,* 321 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). *See,* 4 *Collier on Bankr.* § 547.03 (15th ed. 1982); Countryman, *Bankruptcy Preferences—Current Law and Proposed Changes,* 11 U.C.C.L.J. 95 (1978). *See supra* note 5. However, no mention of this intent is expressed in the House or Senate Reports. In addition, section 547(c)(1) was intended to codify cases such as *Engstrom v. Wiley,* 191 F.2d 684 (9th Cir.1951) and *Engelkes v. Farmers Co-opera-*

*tive Co.,* 194 F.Supp. 319 (N.D.Iowa 1961). Again, the intention was not expressed. Nor is there any explanation offered as to why the thirty day period prescribed by section 3–503(2)(a) of the Uniform Commercial Code was substituted as a test of contemporaneity for the flexible reasonable time standard of pre-Code case law. Nor do the September 28th and October 6th statements offer any reason for finally deciding to protect the transfer no matter when the check is cashed. In fact, it would have been more desirable to retain the "reasonable time" standard of pre-Code case law to determine whether a given transfer came within the section 547(c)(1) exception.

Cong. & Admin.News 1978, p. 6138. A debtor in financial difficulty could deliver checks to favored creditors within the time prescribed by section 547(c)(2), but subject to an understanding that the checks would not be cashed for a specified period of time or until advised to do so by the debtor. The creditors could then cash the checks on the eve of bankruptcy free from attack by the trustee, even though the check was not intended to satisfy the existing obligation when delivered.[11] It is inconceivable that Congress would have knowingly enacted bankruptcy legislation inviting such conduct.

Motion for summary judgment granted. An appropriate order to be submitted.

---

11. The trustee could, of course, attack the transfer if he could establish the collusive agreement. However, to require him to do so would place an intolerable burden upon him—a burden as difficult, if not more difficult, than that imposed by the "reasonable cause to believe" test of section 60. In fact, there has been no explanation offered as to why the check in this case was not promptly presented for payment.